*621 Justice Alito
delivered the opinion of the Court.
This case calls upon us to apply established precedent in a slightly different context. We have previously held that the time for filing a charge of employment discrimination with the Equal Employment Opportunity Commission (EEOC) begins when the discriminatory act occurs. We have explained that this rule applies to any “[discrete ac[t]” of discrimination, including discrimination in “termination, failure to promote, denial of transfer, [and] refusal to hire.” National Railroad Passenger Corporation v. Morgan, 536 U. S. 101,114 (2002). Because a pay-setting decision is a “discrete act,” it follows that the period for filing an EEOC charge begins when the act occurs. Petitioner, having abandoned her claim under the Equal Pay Act, asks us to deviate from our prior decisions in order to permit her to assert her claim under Title VII. Petitioner also contends that discrimination in pay is different from other types of employment discrimination and thus should be governed by a different rule. But because a pay-setting decision is a discrete act that occurs at a particular point in time, these arguments must be rejected. We therefore affirm the judgment of the Court of Appeals.
I
Petitioner Lilly Ledbetter (Ledbetter) worked for respondent Goodyear Tire & Rubber Company (Goodyear) at its Gadsden, Alabama, plant from 1979 until 1998. During much of this time, salaried employees at the plant were given or denied raises based on their supervisors’ evaluation of their performance. In March 1998, Ledbetter submitted a questionnaire to the EEOC alleging certain acts of sex discrimination, and in July of that year she filed a formal EEOC charge. After taking early retirement in November 1998, *622 Ledbetter commenced this action, in which she asserted, among other claims, a Title VII pay discrimination claim and a claim under the Equal Pay Act of 1963 (EPA), 77 Stat. 56, 29 U. S. C. § 206(d).
The District Court granted summary judgment in favor of Goodyear on several of Ledbetter’s claims, including her EPA claim, but allowed others, including her Title VII pay discrimination claim, to proceed to trial. In support of this latter claim, Ledbetter introduced evidence that during the course of her employment several supervisors had given her poor evaluations because of her sex, that as a result of these evaluations her pay was not increased as mueh as it would have been if she had been evaluated fairly, and that these past pay decisions continued to affect the amount of her pay throughout her employment. Toward the end of her time with Goodyear, she was being paid significantly less than any of her male colleagues. Goodyear maintained that the evaluations had been nondiscriminatory, but the jury found for Ledbetter and awarded her backpay and damages.
On appeal, Goodyear contended that Ledbetter’s pay discrimination claim was time barred with respect to all pay decisions made prior to September 26, 1997 — that is, 180 days before the filing of her EEOC questionnaire.[1] And Goodyear argued that no discriminatory act relating to Ledbetter’s pay occurred after that date.
The Court of Appeals for the Eleventh Circuit reversed, holding that a Title VII pay discrimination claim cannot be based on any pay decision that occurred prior to the last pay decision that affected the employee’s pay during the EEOC *623 charging period. 421 F. 3d 1169, 1182-1183 (2005). The Court of Appeals then concluded that there was insufficient evidence to prove that Goodyear had acted with discriminatory intent in making the only two pay decisions that occurred within that time span, namely, a decision made in 1997 to deny Ledbetter a raise and a similar decision made in 1998. Id., at 1186-1187.
Ledbetter filed a petition for a writ of certiorari but did not seek review of the Court of Appeals’ holdings regarding the sufficiency of the evidence in relation to the 1997 and 1998 pay decisions. Rather, she sought review of the following question:
“Whether and under what circumstances a plaintiff may bring an action under Title VII of the Civil Rights Act of 1964 alleging illegal pay discrimination when the disparate pay is received during the statutory limitations period, but is the result of intentionally discriminatory pay decisions that occurred outside the limitations period.” Pet. for Cert. i.
In light of disagreement among the Courts of Appeals as to the proper application of the limitations period in Title VII disparate-treatment pay cases, compare 421 F. 3d 1169 with Forsyth v. Federation Employment & Guidance Serv., 409 F. 3d 565 (CA2 2005); Shea v. Rice, 409 F. 3d 448 (CADC 2005), we granted certiorari, 548 U. S. 903 (2006).
II
Title VII of the Civil Rights Act of 1964 makes it an “unlawful employment practice” to discriminate “against any individual with respect to his compensation . . . because of such individual’s . . . sex.” 42 U. S. C. § 2000e-2(a)(1). An individual wishing to challenge an employment practice under this provision must first file a charge with the EEOC. § 2000e~5(e)(l). Such a charge must be filed within a specified period (either 180 or 300 days, depending on the State) *624 “after the alleged unlawful employment practice occurred,” ibid., and if the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court, § 2000e — 5(f)(1).
In addressing the issue whether an EEOC charge was filed on time, we have stressed the need to identify with care the specific employment practice that is at issue. Morgan, 536 U. S., at 110-111. Ledbetter points to two different employment practices as possible candidates. Primarily, she urges us to focus on the paychecks that were issued to her during the EEOC charging period (the 180-day period preceding the filing of her EEOC questionnaire), each of which, she contends, was a separate act of discrimination. Alternatively, Ledbetter directs us to the 1998 decision denying her a raise, and she argues that this decision was “unlawful because it carried forward intentionally discriminatory disparities from prior years.” Reply Brief for Petitioner 20. Both of these arguments fail because they would require us in effect to jettison the defining element of the legal claim on which her Title VII recovery was based.
Ledbetter asserted disparate treatment, the central element of which is discriminatory intent. See Chardon v. Fernandez, 454 U. S. 6, 8 (1981) (per curiam); Teamsters v. United States, 431 U. S. 324, 335, n. 15 (1977); Watson v. Fort Worth Bank & Trust, 487 U. S. 977, 1002 (1988) (Blackmun, J., joined by Brennan, and Marshall, JJ., concurring in part and concurring in judgment) (“[A] disparate-treatment challenge focuses exclusively on the intent of the employer”). However, Ledbetter does not assert that the relevant Goodyear decisionmakers acted with actual discriminatory intent either when they issued her checks during the EEOC charging period or when they denied her a raise in 1998. Rather, she argues that the paychecks were unlawful because they would have been larger if she had been evaluated in a nondiscriminatory manner prior to the EEOC charging period. Brief for Petitioner 22. Similarly, she maintains that the *625 1998 decision was unlawful because it “carried forward” the effects of prior, uncharged discrimination decisions. Reply Brief for Petitioner 20. In essence, she suggests that it is sufficient that discriminatory acts that occurred prior to the charging period had continuing effects during that period. Brief for Petitioner 13 (“[E]ach paycheck that offers a woman less pay than a similarly situated man because of her sex is a separate violation of Title VII with its own limitations period, regardless of whether the paycheck simply implements a prior discriminatory decision made outside the limitations period”); see also Reply Brief for Petitioner 20. This argument is squarely foreclosed by our precedents.
In United Air Lines, Inc. v. Evans, 431 U. S. 553 (1977), we rejected an argument that is basically the same as Ledbetter’s. Evans was forced to resign because the airline refused to employ married flight attendants, but she did not file an EEOC charge regarding her termination. Some years later, the airline rehired her but treated her as a new employee for seniority purposes. Id., at 554-555. Evans then sued, arguing that, while any suit based on the original discrimination was time barred, the airline’s refusal to give her credit for her prior service gave “present effect to [its] past illegal act and therefore perpetuate[d] the consequences of forbidden discrimination.” Id., at 557.
We agreed with Evans that the airline’s “seniority system [did] indeed have a continuing impact on her pay and fringe benefits,” id., at 558, but we noted that “the critical question [was] whether any present violation exist[ed],” ibid, (emphasis in original). We concluded that the continuing effects of the precharging period discrimination did not make out a present violation. As Justice Stevens wrote for the Court:
“United was entitled to treat [Evans’ termination] as lawful after respondent failed to file a charge of discrimination within the 90 days then allowed by § 706(d). A discriminatory act which is not made the basis for a *626 timely charge ... is merely an unfortunate event in history which has no present legal consequences.” Ibid.
It would be difficult to speak to the point more directly.
Equally instructive is Delaware State College v. Ricks, 449 U. S. 250 (1980), which concerned a college professor, Ricks, who alleged that he had been discharged because of national origin. In March 1974, Ricks was denied tenure, but he was given a final, nonrenewable 1-year contract that expired on June 30, 1975. Id., at 252-253. Ricks delayed filing a charge with the EEOC until April 1975, id., at 254, but he argued that the EEOC charging period ran from the date of his actual termination rather than from the date when tenure was denied. In rejecting this argument, we recognized that “one of the effects of the denial of tenure,” namely, his ultimate termination, “did not occur until later.” Id., at 258 (emphasis in original). But because Ricks failed to identify any specific discriminatory act “that continued until, or occurred at the time of, the actual termination of his employment,” id., at 257, we held that the EEOC charging period ran from “the time the tenure decision was made and communicated to Ricks,” id., at 258.
This same approach dictated the outcome in Lorance v. AT&T Technologies, Inc., 490 U. S. 900 (1989), which grew out of a change in the way in which seniority was calculated under a collective-bargaining agreement. Before 1979, all employees at the plant in question accrued seniority based simply on years of employment at the plant. In 1979, a new agreement made seniority for workers in the more highly paid (and traditionally male) position of “tester” depend on time spent in that position alone and not in other positions in the plant. Several years later, when female testers were laid off due to low seniority as calculated under the new provision, they filed an EEOC charge alleging that the 1979 scheme had been adopted with discriminatory intent, namely, to protect incumbent male testers when women with sub *627 stantial plant seniority began to move into the traditionally male tester positions. Id., at 902-903.
We held that the plaintiffs’ EEOC charge was not timely because it was not filed within the specified period after the adoption in 1979 of the new seniority rule. We noted that the plaintiffs had not alleged that the new seniority rule treated men and women differently or that the rule had been applied in a discriminatory manner. Rather, their complaint was that the rule was adopted originally with discriminatory intent. Id., at 905. And as in Evans and Ricks, we held that the EEOC charging period ran from the time when the discrete act of alleged intentional discrimination occurred, not from the date when the effects of this practice were felt. 490 U. S., at 907-908. We stated:
“Because the claimed invalidity of the facially nondiscriminatory and neutrally applied tester seniority system is wholly dependent on the alleged illegality of signing the underlying agreement, it is the date of that signing which governs the limitations period.” Id., at 911.[2]
*628 Our most recent decision in this area confirms this understanding. In Morgan, we explained that the statutory term “employment practice” generally refers to “a discrete act or single ‘occurrence’ ” that takes place at a particular point in time. 536 U. S., at 110-111. We pointed to “termination, failure to promote, denial of transfer, [and] refusal to hire” as examples of such “discrete” acts, and we held that a Title VII plaintiff “can only file a charge to cover discrete acts that ‘occurred’ within the appropriate time period.” Id., at 114.
The instruction provided by Evans, Ricks, Lorance, and Morgan is clear. The EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination. But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed. See Morgan, supra, at 113.
Ledbetter’s arguments here — that the paychecks that she received during the charging period and the 1998 raise denial each violated Title VII and triggered a new EEOC charging period — cannot be reconciled with Evans, Ricks, Lorance, and Morgan. Ledbetter, as noted, makes no claim that intentionally discriminatory conduct occurred during the charging period or that discriminatory decisions that occurred prior to that period were not communicated to her. Instead, she argues simply that Goodyear’s conduct during the charging period gave present effect to discriminatory conduct outside of that period. Brief for Petitioner 13. But current effects alone cannot breathe life into prior, uncharged discrimination; as we held in Evans, such effects in themselves have “no present legal consequences.” 431 U. S., at 558. Ledbetter should have filed an EEOC charge within 180 days after each allegedly discriminatory pay decision was made and communicated to her. She did not do so, *629 and the paychecks that were issued to her during the 180 days prior to the filing of her EEOC charge do not provide a basis for overcoming that prior failure.
In an effort to circumvent the need to prove discriminatory intent during the charging period, Ledbetter relies on the intent associated with other decisions made by other persons at other times. Reply Brief for Petitioner 6 (“Intentional discrimination .. . occurs when . .. differential treatment takes place, even if the intent to engage in that conduct for a discriminatory purpose was made previously”).
Ledbetter’s attempt to take the intent associated with the prior pay decisions and shift it to the 1998 pay decision is unsound. It would shift intent from one act (the act that consummates the discriminatory employment practice) to a later act that was not performed with bias or discriminatory motive. The effect of this shift would be to impose liability in the absence of the requisite intent.
Our cases recognize this point. In Evans, for example, we did not take the airline’s discriminatory intent in 1968, when it discharged the plaintiff because of her sex, and attach that intent to its later act of neutrally applying its seniority rules. Similarly, in Ricks, we did not take the discriminatory intent that the college allegedly possessed when it denied Ricks tenure and attach that intent to its subsequent act of terminating his employment when his nonrenewable contract ran out. On the contrary, we held that “the only alleged discrimination occurred — and the filing limitations periods therefore commenced — at the time the tenure decision was made and communicated to Ricks.” 449 U. S., at 258.
Not only would Ledbetter’s argument effectively eliminate the defining element of her disparate-treatment claim, but it would distort Title VII’s “integrated, multistep enforcement procedure.” Occidental Life Ins. Co. of Cal. v. EEOC, 432 U. S. 355, 359 (1977). We have previously noted the legislative compromises that preceded the enactment of Title VII, *630 Mohasco Corp. v. Silver, 447 U. S. 807, 819-821 (1980); EEOC v. Commercial Office Products Co., 486 U. S. 107, 126 (1988) (Stevens, J., joined by Rehnquist, C. J., and Scalia, J., dissenting). Respectful of the legislative process that crafted this scheme, we must “give effect to the statute as enacted,” Mohasco, supra, at 819, and we have repeatedly rejected suggestions that we extend or truncate Congress’ deadlines. See, e. g., Electrical Workers v. Robbins & Myers, Inc., 429 U. S. 229, 236-240 (1976) (union grievance procedures do not toll EEOC filing deadline); Alexander v. Gardner-Denver Co., 415 U. S. 36, 47-49 (1974) (arbitral decisions do not foreclose aecess to court following a timely filed EEOC complaint).
Statutes of limitations serve a policy of repose. American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554-555 (1974). They
“represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that ‘the right to be free of stale claims in time comes to prevail over the right to prosecute them.’” United States v. Kubrick, 444 U. S. 111, 117 (1979) (quoting Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 349 (1944)).
The EEOC filing deadline “protect[s] employers from the burden of defending claims arising from employment decisions that are long past.” Ricks, supra, at 256-257. Certainly, the 180-day EEOC charging deadline, 42 U. S. C. §2000e-5(e)(l), is short by any measure, but “[b]y choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination.” Mohasco, supra, at 825. This short deadline reflects Congress’ strong preference for the prompt resolution of employment discrimination allega *631 tions through voluntary conciliation and cooperation. Occidental Life Ins., supra, at 367-368; Alexander, supra, at 44.
A disparate-treatment claim comprises two elements: an employment practice, and discriminatory intent. Nothing in Title VII supports treating the intent element of Ledbetter’s claim any differently from the employment practice element.[3] If anything, concerns regarding stale claims weigh more heavily with respect to proof of the intent associated with employment practices than with the practices themselves. For example, in a ease such as this in which the plaintiff’s claim concerns the denial of raises, the employer’s challenged acts (the decisions not to increase the employee’s pay at the times in question) will almost always be documented and will typically not even be in dispute. By contrast, the employer’s intent is almost always disputed, and evidence relating to intent may fade quickly with time. In most disparate-treatment cases, much if not all of the evidence of intent is circumstantial. Thus, the critical issue in a case involving a long-past performance evaluation will often be whether the evaluation was so far off the mark that a sufficient inference of discriminatory intent can be drawn. See Watson, 487 U. S., at 1004 (Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and concurring in judgment) (noting that in a disparate-treatment claim, the McDonnell Douglas Corp. v. Green, 411 U. S. 792 (1973), factors establish discrimination by inference). See also, e. g., Zhuang v. Datacard *632 Corp., 414 F. 3d 849 (CA8 2005) (rejecting inference of discrimination from performance evaluations); Cooper v. Southern Co., 390 F. 3d 695, 732-733 (CA11 2004) (same). This can be a subtle determination, and the passage of time may seriously diminish the ability of the parties and the factfinder to reconstruct what actually happened.[4]
Ledbetter contends that employers would be protected by the equitable doctrine of laches, but Congress plainly did not think that laches was sufficient in this context. Indeed, Congress took a diametrically different approach, including in Title VII a provision allowing only a few months in most cases to file a charge with the EEOC. 42 U. S. C. § 2000e-5(e)(l).
Ultimately, “experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.” Mohasco, supra, at 826. By operation of §§2000e-5(e)(1) and 2000e-5(f)(1), a Title VII “claim is time barred if it is not filed within these time limits.” Morgan, 536 U. S., at 109; Electrical Workers, 429 U. S., at 236. We therefore reject the suggestion that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period. Ledbetter’s claim is, for this reason, untimely.
*633 III
A
In advancing her two theories Ledbetter does not seriously contest the logic of Evans, Ricks, Lorance, and Morgan as set out above, but rather argues that our decision in Bazemore v. Friday, 478 U. S. 385 (1986) (per curiam), requires different treatment of her claim because it relates to pay. Ledbetter focuses specifically on our statement that “[e]ach week’s paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII.” Id., at 395. She argues that in Bazemore we adopted a “paycheck accrual rule” under which each paycheck, even if not accompanied by discriminatory intent, triggers a new EEOC charging period during which the complainant may properly challenge any prior discriminatory conduct that impacted the amount of that paycheck, no matter how long ago the discrimination occurred. On this reading, Bazemore dispensed with the need to prove actual discriminatory intent in pay eases and, without giving any hint that it was doing so, repudiated the very different approach taken previously in Evans and Ricks. Ledbetter’s interpretation is unsound.
Bazemore concerned a disparate-treatment pay claim brought against the North Carolina Agricultural Extension Service (Service). 478 U. S., at 389-390. Service employees were originally segregated into “a white branch” and “a ‘Negro branch,’” with the latter receiving less pay, but in 1965 the two branches were merged. Id., at 390-391. After Title VII was extended to public employees in 1972, black employees brought suit claiming that pay disparities attributable to the old dual pay scale persisted. Id., at 391. The Court of Appeals rejected this claim, which it interpreted to be that the “ ‘discriminatory difference in salaries should have been affirmatively eliminated.’” Id., at 395.
This Court reversed in a per curiam opinion, id., at 386-388, but all of the Members of the Court joined Justice Bren *634 nan’s separate opinion, see id., at 388 (opinion concurring in part). Justice Brennan wrote:
“The error of the Court of Appeals with respect to salary disparities created prior to 1972 and perpetuated thereafter is too obvious to warrant extended discussion: that the Extension Service discriminated with respect to salaries prior to the time it was covered by Title VII does not excuse perpetuating that discrimination after the Extension Service became covered by Title VII. To hold otherwise would have the effect of exempting from liability those employers who were historically the greatest offenders of the rights of blacks. A pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII’s effective date, and to the extent an employer continued to engage in that act or practice, it is liable under that statute. While recovery may not be permitted for pre-1972 acts of discrimination, to the extent that this discrimination was perpetuated after 1972, liability may be imposed.” Id., at 395 (emphasis in original).
Far from adopting the approach that Ledbetter advances here, this passage made a point that was “too obvious to warrant extended discussion,” ibid.; namely, that when an employer adopts a facially discriminatory pay structure that puts some employees on a lower scale because of race, the employer engages in intentional discrimination whenever it issues a check to one of these disfavored employees. An employer that adopts and intentionally retains such a pay structure can surely be regarded as intending to discriminate on the basis of race as long as the structure is used.
Bazemore thus is entirely consistent with our prior precedents, as Justice Brennan’s opinion took care to point out. Noting that Evans turned on whether “ ‘any present violation exist[ed],’” Justice Brennan stated that the Bazemore *635 plaintiffs were alleging that the defendants “ha[d] not from the date of the Act forward made all their employment decisions in a wholly nondiscriminatory way,” 478 U. S., at 396-397, n. 6 (emphasis in original; internal quotation marks and brackets omitted) — which is to say that they had engaged in fresh discrimination. Justice Brennan added that the Court’s “holding in no sense g[ave] legal effect to the pre1972 actions, but, consistent with Evans . . . focuse[d] on the present salary structure, which is illegal if it is a mere continuation of the pre-1965 discriminatory pay structure.” Id., at 397, n. 6 (emphasis added).
The sentence in Justice Brennan’s opinion on which Led-better chiefly relies comes directly after the passage quoted above, and makes a similarly obvious point:
“Each week’s payeheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII.” Id., at 39S-396.[5]
*636 In other words, a freestanding violation may always be charged within its own charging period regardless of its connection to other violations. We repeated this same point more recently in Morgan: “The existence of past acts and the employee’s prior knowledge of their occurrence . .. does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.” 536 U. S., at 113.[6] Neither of these opinions stands for the proposition that an action not comprising an employment practice and alleged discriminatory intent is separately chargeable, just because it is related to some past act of discrimination.
Ledbetter attempts to eliminate the obvious inconsistencies between her interpretation of Bazemore and the Evans/ Ricks/Lorance/Morgan line of cases on the ground that none of the latter cases involved pay raises, but the logic of our prior cases is folly applicable to pay cases. To take Evans *637 as an example, the employee there was unlawfully terminated; this caused her to lose seniority; and the loss of seniority affected her wages, among other things. 431 U. S., at 555, n. 5 (“[Sjeniority determine[s] a flight attendant’s wages; the duration and timing of vacations; rights to retention in the event of layoffs and rights to re-employment thereafter; and rights to preferential selection of flight assignments”). The relationship between past discrimination and adverse present effects was the same in Evans as it is here. Thus, the argument that Ledbetter urges us to accept here would necessarily have commanded a different outcome in Evans.
Bazemore stands for the proposition that an employer violates Title VII and triggers a new EEOC charging period whenever the employer issues paychecks using a discriminatory pay structure. But a new Title VII violation does not occur and a new charging period is not triggered when an employer issues paychecks pursuant to a system that is “facially nondiscriminatory and neutrally applied.” Lorance, 490 U. S., at 911. The fact that precharging period discrimination adversely affects the calculation of a neutral factor (like seniority) that is used in determining future pay does not mean that each new paycheck constitutes a new violation and restarts the EEOC charging period.
Because Ledbetter has not adduced evidence that Goodyear initially adopted its performance-based pay system in order to discriminate on the basis of sex or that it later applied this system to her within the charging period with any discriminatory animus, Bazemore is of no help to her. Rather, all Ledbetter has alleged is that Goodyear’s agents discriminated against her individually in the past and that this discrimination reduced the amount of later paychecks. Because Ledbetter did not file timely EEOC charges relating to her employer’s discriminatory pay decisions in the past, she cannot maintain a suit based on that past discrimination at this time.
*638 B
The dissent also argues that pay claims are different. Its principal argument is that a pay discrimination claim is like a hostile work environment claim because both types of claims are “‘based on the cumulative effect of individual acts/” post, at 648, but this analogy overlooks the critical conceptual distinction between these two types of claims. And although the dissent relies heavily on Morgan, the dissent’s argument is fundamentally inconsistent with Morgan’s reasoning.
Morgan distinguished between “discrete” acts of discrimination and a hostile work environment. A discrete act of discrimination is an act that in itself “constitutes a separate actionable ‘unlawful employment practice’ ” and that is temporally distinct. 536 U. S., at 114, 117. As examples we identified “termination, failure to promote, denial of transfer, or refusal to hire.” Id., at 114. A hostile work environment, on the other hand, typically comprises a succession of harassing acts, each of which “may not be actionable on its own.” In addition, a hostile work environment claim “cannot be said to occur on any particular day.” Id., at 115-116. In other words, the actionable wrong is the environment, not the' individual acts that, taken together, create the environment.[7]
Contrary to the dissent’s assertion, post, at 648-649, what Ledbetter alleged was not a single wrong consisting of a succession of acts. Instead, she alleged a series of discrete dis *639 criminatory acts, see Brief for Petitioner 13,15 (arguing that payment of each paycheck constituted a separate violation of Title VII), each of which was independently identifiable and actionable, and Morgan is perfectly clear that when an employee alleges “serial violations,” i. e., a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation. 536 U. S., at 113.
While this fundamental misinterpretation of Morgan is alone sufficient to show that the dissent’s approach must be rejected, it should also be noted that the dissent is coy as to whether it would apply the same rule to all pay discrimination claims or whether it would limit the rule to eases like Ledbetter’s, in which multiple discriminatory pay decisions are alleged. The dissent relies on the fact that Ledbetter was allegedly subjected to a series of discriminatory pay decisions over a period of time, and the dissent suggests that she did not realize for some time that she had been victimized. But not all pay cases share these characteristics.
If, as seems likely, the dissent would apply the same rule in all pay cases, then, if a single discriminatory pay decision made 20 years ago continued to affect an employee’s pay today, the dissent would presumably hold that the employee could file a timely EEOC charge today. And the dissent would presumably allow this even if the employee had full knowledge of all the circumstances relating to the 20-year-old decision at the time it was made.[8] The dissent, it appears, proposes that we adopt a special rule for pay cases based on the particular characteristics of one case that is *640 certainly not representative of all pay cases and may not even be typical. We refuse to take that approach.
IV
In addition to the arguments previously discussed, Ledbetter relies largely on analogies to other statutory regimes and on extrastatutory policy arguments to support her “paycheck accrual rule.”
A
Ledbetter places significant weight on the EPA, which was enacted contemporaneously with Title VII and prohibits paying unequal wages for equal work because of sex. 29 U. S. C. § 206(d). Stating that “the lower courts routinely hear [EPA] claims challenging pay disparities that first arose outside the limitations period,” Ledbetter suggests that we should hold that Title VII is violated each time an employee receives a paycheck that reflects past discrimination. Brief for Petitioner 34-85.
The simple answer to this argument is that the EPA and Title VII are not the same. In particular, the EPA does not require the filing of a charge with the EEOC or proof of intentional discrimination. See § 206(d)(1) (asking only whether the alleged inequality resulted from “any other factor other than sex”). Ledbetter originally asserted an EPA claim, but that claim was dismissed by the District Court and is not before us. If Ledbetter had pursued her EPA claim, she would not face the Title VII obstacles that she now confronts.[9]
*641 Ledbetter’s appeal to the Fair Labor Standards Act of 1938 (FLSA) is equally unavailing. Stating that it is “well established that the statute of limitations for violations of the minimum wage and overtime provisions of the [FLSA] runs anew with each paycheck,” Brief for Petitioner 35, Led-better urges that the same should be true in a Title VII pay case. Again, however, Ledbetter’s argument overlooks the fact that an FLSA minimum wage or overtime claim does not require proof of a specific intent to discriminate. See 29 U. S. C. § 207 (establishing overtime rules); cf. § 255(a) (establishing 2-year statute of limitations for FLSA claims, except for claims of a “willful violation,” which may be commenced within 3 years).
Ledbetter is on firmer ground in suggesting that we look to cases arising under the National Labor Relations Act (NLRA) since the NLRA provided a model for Title VIPs remedial provisions and, like Title VII, requires the filing of a timely administrative charge (with the National Labor Relations Board) before suit may be maintained. Lorance, 490 U. S., at 909; Ford Motor Co. v. EEOC, 458 U. S. 219, 226, n. 8 (1982). Cf. 29 U. S. C. § 160(b) (“[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board”).
•Ledbetter argues that the NLRA’s 6-month statute of limitations begins anew for each paycheck reflecting a prior violation of the statute, but our precedents suggest otherwise. In Machinists v. NLRB, 362 U. S. 411, 416-417 (1960), we *642 held that “where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice[,] the use of the earlier unfair labor practice [merely] serves to cloak with illegality that which was otherwise lawful.” This interpretation corresponds closely to our analysis in Evans and Ricks and supports our holding in the present case.
B
Ledbetter, finally, makes a variety of policy arguments in favor of giving the alleged victims of pay discrimination more time before they are required to file a charge with the EEOC. Among other things, she claims that pay discrimination is harder to detect than other forms of employment discrimination.[10]
We are not in a position to evaluate Ledbetter’s policy arguments, and it is not our prerogative to change the way in which Title VII balances the interests of aggrieved employees against the interest in encouraging the “prompt processing of all charges of employment discrimination,” Mohasco, 447 U. S., at 825, and the interest in repose.
Ledbetter’s policy arguments for giving special treatment to pay claims find no support in the statute and are inconsistent with our precedents.[11] We apply the statute as written, *643 and this means that any unlawful employment practice, including those involving compensation, must be presented to the EEOC within the period prescribed by statute.
* * *
For these reasons, the judgment of the Court of Appeals for the Eleventh Circuit is affirmed.

It is so ordered.

 The parties assume that the EEOC charging period runs backwards from the date of the questionnaire, even though Ledbetter’s discriminatory pay claim was not added until the July 1998 formal charge. 421 F. 3d 1169, 1178 (CA11 2005). We likewise assume for the sake of argument that the filing of the questionnaire, rather than the formal charge, is the appropriate date.

 After Lorance, Congress amended Title VII to cover the specific situation involved in that case. See 42 U. S. C. § 2000e-5(e)(2) (allowing for Title VII liability arising from an intentionally discriminatory seniority system both at the time of its adoption and at the time of its application). The dissent attaches great significance to this amendment, suggesting that it shows that Lorance was wrongly reasoned as an initial matter. Post, at 652-654 (opinion of Ginsbukg, J.). However, the very legislative history cited by the dissent explains that this amendment and the other 1991 Title VII amendments “ ‘expanded] the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination.’” Post, at 653 (emphasis added). For present purposes, what is most important about the amendment in question is that it applied only to the adoption of a discriminatory seniority system, not to other types of employment discrimination. Evans and Ricks, upon which Lorance relied, 490 U. S., at 906-908, and which employed identical reasoning, were left in place, and these decisions are more than sufficient to support our holding today.

 Of course, there may be instances where the elements forming a cause of action span more than 180 days. Say, for instance, an employer forms an illegal discriminatory intent toward an employee but does not act on it until 181 days later. The charging period would not begin to run until the employment practice was executed on day 181 because until that point the employee had no cause of action. The act and intent had not yet been joined. Here, by contrast, Ledbetter’s cause of action was fully formed and present at the time that the discriminatory employment actions were taken against her, at which point she could have, and should have, sued.

 The dissent dismisses this concern, post, at 657-658, but this case illustrates the problems created by tardy lawsuits. Ledbetter’s claims of sex discrimination turned principally on the misconduct of a single Goodyear supervisor, who, Ledbetter testified, retaliated against her when she rejected his sexual advances during the early 1980's, and did so again in the mid-1990’s when he falsified deficiency reports about her work. His misconduct, Ledbetter argues, was “a principal basis for [her] performance evaluation in 1997.” Brief for Petitioner 6; see also id., at 5-6, 8, 11 (stressing the same supervisor’s misconduct). Yet, by the time of trial, this supervisor had died and therefore could not testify. A timely charge might have permitted his evidence to be weighed contemporaneously.

 That the focus in Bazemore was on a current violation, not the carrying forward of a past act of discrimination, was made clearly by the side opinion in the Court of Appeals:
“[T]he majority holds, in effect, that because the pattern of discriminatory salaries here challenged originated before applicable provisions of the Civil Rights Act made their payment illegal, any ‘fingering effects’ of that earlier pattern cannot (presumably on an indefinitely maintained basis) be considered in assessing a challenge to post-act continuation of that pattern.
“Hazelwood [School Dist. v. United States, 433 U. S. 299 (1977),] and Evans indeed made it clear that an employer cannot be found liable, or sanctioned with remedy, for employment decisions made before they were declared illegal or as to which the claimant has lost any right of action by lapse of time. For this reason it is generally true that, as the catch-phrase has it, Title VII imposed ‘no obligation to catch-up,’ i. e., affirmatively to remedy present effects of pre-Act discrimination, whether in composing a work force or otherwise. But those cases cannot be thought to insulate employment decisions that presently are illegal on the basis that at one time comparable decisions were legal when made by the particular em *636 ployer. It is therefore one thing to say that an employer who upon the effective date of Title VII finds itself with a racially unbalanced work-force need not act affirmatively to redress the balance; and quite another to say that it may also continue to make discriminatory hiring decisions because it was by that means that its present work force was composed. It may not, in short, under the Hazelwood/Evans principle continue practices now violative simply because at one time they were not.” Bazemore v. Friday, 751 F. 2d 662, 695-696 (CA4 1984) (Phillips, J., concurring in part and dissenting in part) (emphasis in original; footnotes omitted).

 The briefs filed with this Court in Bazemore v. Friday, 478 U. S. 385 (1986) (per curiam), further elucidate the point. The petitioners described the Service’s conduct as “[t]he continued use of a racially explicit base wage.” Brief for Petitioner Bazemore et al. in Bazemore v. Friday, O. T. 1985, No. 85-93, p. 33. The United States’ brief also properly distinguished the commission of a discrete discriminatory act with continuing adverse results from the intentional carrying forward of a discriminatory pay system. Brief for Federal Petitioners in Bazemore v. Friday, O. T. 1984, Nos. 85-93 and 85-428, p. 17. This case involves the former, not the latter.

 Moreover, the proposed hostile salary environment claim would go far beyond Morgan’s limits. Morgan still required at least some of the discriminatorily motivated acts predicate to a hostile work environment claim to occur within the charging period. 536 U. S., at 117 (“Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court” (emphasis added)). But the dissent would permit claims where no one acted in any way with an improper motive during the charging period. Post, at 649, 657-658.

 The dissent admits as much, responding only that an employer could resort to equitable doctrines such as laches. Post, at 657-658. But first, as we have noted, Congress has already determined that defense to be insufficient. Supra, at 632. Second, it is far from clear that a suit filed under the dissent’s theory, alleging that a paycheck paid recently within the charging period was itself a freestanding violation of Title VII because it reflected the effects of 20-year-old discrimination, would even be barred by laches.

 The Magistrate Judge recommended dismissal of Ledbetter’s EPA claim on the ground that Goodyear had demonstrated that the pay disparity resulted from Ledbetter’s consistently weak performance, not her sex. App. to Pet. for Cert. 71a-77a. The Magistrate Judge also recommended dismissing the Title VII disparate-pay claim on the same basis. Id., at 65a-69a. Ledbetter objected to the Magistrate Judge’s disposition of the Title VII and EPA claims, arguing that the Magistrate Judge had improperly resolved a disputed factual issue. See Plaintiff’s Objections to Mag *641 istrate Judge’s Report and Recommendation, 1 Record in No. 03-15264-G (CA11), Doc. 32. The District Court sustained this objection as to the “disparate pay” claim, but without specifically mentioning the EPA claim, which had been dismissed by the Magistrate Judge on the same basis. See App. to Pet. for Cert. 43a-44a. While the record is not entirely clear, it appears that at this point Ledbetter elected to abandon her EPA claim, proceeding to trial with only the Title VII disparate-pay claim, thus giving rise to the dispute the Court must now resolve.

 We have previously declined to address whether Title VII suits are amenable to a discovery rule. National Railroad Passenger Corporation v. Morgan, 536 U. S. 101, 114, n. 7 (2002). Because Ledbetter does not argue that such a rule would change the outcome in her case, we have no occasion to address this issue.

 Ledbetter argues that the EEOC’s endorsement of her approach in its Compliance Manual and in administrative adjudications merits deference. But we have previously declined to extend Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984), deference to the Compliance Manual, Morgan, supra, at 111, n. 6, and similarly decline to defer to the EEOC’s adjudicatory positions. The EEOC’s views in question are based on its misreading of Bazemore. See, e. g., Amft v. Mineta, No. 07A40116, 2008 WL 985183, *5 (EEOC Office of Fed. Operations, Apr. 6, 2006); Albritton v. Potter, No. 01A44063, 2004 WL *643 2983682, *2 (EEOC Office of Fed. Operations, Dec. 17, 2004). Agencies have no special claim to deference in their interpretation of our decisions. Reno v. Bossier Parish School Bd., 528 U. S. 320,336, n. 5 (2000). Nor do we see reasonable ambiguity in the statute itself, which makes no distinction between compensation and other sorts of claims and which clearly requires that discrete employment actions alleged to be unlawful be motivated “because of such individual’s . . . sex.” 42 U. S. C. §2000e-2(a)(1).