**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-3877
_____

EMMANUEL NOEL,
                              Appellant

v.

THE BOEING COMPANY
_____

On Appeal from the District Court
for the Eastern District of Pennsylvania
(No. 06-cv-2673)
District Judge: Honorable J. Curtis Joyner

_____

Submitted January 26, 2010
Before: FUENTES, FISHER, <u>Circuit Judges</u>, and KANE,
<u>District Judge</u>[*]

---

[*] Honorable Yvette Kane, Chief Judge of the United
States District Court for the Middle District of Pennsylvania,
sitting by designation.

(Opinion Filed: October 1, 2010)

Albert J. Michell, Esq.
Albert J. Michell, PC
510 Bainbridge Street
First Floor
Philadelphia, PA 19147
*Attorney for Appellant*

Thomas K. Johnson II, Esq.
Leora F. Eisenstadt, Esq.
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
*Attorneys for Appellees*

---

OPINION OF THE COURT

---

FUENTES, Circuit Judge:

Emmanuel Noel appeals from the District Court's grant of summary judgment in The Boeing Company's favor on his employment discrimination claim brought under Title VII of the Civil Rights Act of 1964. On appeal Noel argues that the

-2-

recently enacted Lilly Ledbetter Fair Pay Act of 2009 renders his otherwise out-of-time administrative filing timely, preserving his failure-to-promote claim. For the following reasons, we will affirm the District Court's ruling.

## I.

## A. Background

Noel is a black Haitian national, who began working for Boeing in 1990 as a sheet metal assembler at its Ridely Park, Pennsylvania facility.[1] Noel was hired at Labor Grade 5 and repaired Chinook 47 aircraft. The terms of Noel's employment were governed by a collective bargaining agreement ("CBA") between Boeing and the International Union of United Automobile Aerospace and Agricultural Implement Workers of America Local 1069, as well as internal Boeing policies.

Boeing employees were occasionally offered an opportunity to work at offsite locations. Because employees working offsite received greater pay, per diems and additional training, offsite positions were coveted and individuals volunteered for these assignments. Any promotions and corresponding raises were limited to the duration of the offsite assignment. According to the CBA that governed Noel's employment, seniority was not the only factor that Boeing considered when assigning workers offsite. Rather, skill and ability were the determining factors, and seniority was only considered when those factors were equal.

---

[1] Unless otherwise noted, the following facts are derived from the District Court's factual findings.

-3-

Noel took his first offsite assignment in 1991 at a Boeing facility in Shreveport, Louisiana; this lasted approximately six months. Although he sought an offsite assignment in May 2002, Noel was not assigned offsite again until November 2002, when he was designated an aircraft mechanic to work on modifications to the V-22 Osprey at the Bell Helicopter facility in Amarillo, Texas. That assignment resulted in Noel's labor grade rising from 7 to 8; he also received a $57 per diem. After two weeks of working in Amarillo, Noel's salary was increased from $26.11 per hour to $28.75 per hour.

Around the same time, Chris Carlin and Gary Newman, both white employees, were also assigned to Amarillo from the Ridley Park facility. They too were reclassified from Labor Grade 7 aircraft assemblers to offsite mechanics at Labor Grade 8. After working in Amarillo for seven months, Carlin and Newman were promoted to Offsite Mechanic General, Labor Grade 11, while Noel remained at the lower paying Grade 8. In September 2003, Noel complained about these promotions to a union representative and a Boeing labor relations representative. His complaints went unanswered. Noel filed a Title VII suit against Boeing and one of its managers alleging discrimination based on race and national origin. On March 25, 2005, Noel filed a formal grievance with the Equal Employment Opportunity Commission ("EEOC").

On June 20, 2006, Noel filed a four-count Title VII complaint against Boeing. He thereafter amended the complaint. Count I of the Amended Complaint accused Boeing of intentional discrimination and disparate treatment based on Noel's race and national origin. Count II raised the same issue under the Pennsylvania Human Rights Act. Count III levied a

-4-

retaliation claim against Boeing, and Count IV demanded punitive damages. These claims were based on several specific incidents referenced by Noel in his complaint. Relevant to this appeal, Noel complained: (1) that Boeing did not send him offsite to Amarillo in May 2002 when white, non-Haitian employees who held the same job as Noel but were junior to him were sent offsite; and (2) in 2003, while offsite at Amarillo, he was promoted to Labor Grade 8 while his junior, white, U.S.-born co-workers were promoted to Labor Grade 11.[2]

## B. The District Court's Ruling

After a four-day bench trial, the District Court ruled in Boeing's favor on all counts. The District Court first granted Defendant's summary judgment motion on Noel's claim that Boeing violated Title VII when it failed to send him offsite to Amarillo in May 2002 and when he was not promoted to offsite mechanic Labor Grade 11 in 2003, holding that this claim was time-barred since Noel did not file a charge of discrimination with the EEOC until March 2005, well outside the 300-day statutory time period. The District Court also granted Defendants' motions for Judgment on Partial Findings on Noel's claim that he should have been promoted to lead mechanic upon his return to Ridley Park. Judgment was also awarded in Boeing's favor regarding Noel's erroneous placement on Boeing's offsite list, which stymied his promotion, since

---

[2] Noel's complaint included several additional adverse employment actions. Because Noel does not challenge the District Court's rulings regarding those claims, we find it unnecessary to discuss them in further detail.

-5-

Defendants subsequently promoted Noel and awarded him backpay.

Next, the District Court granted judgment in Defendants' favor on Noel's claim that race- and national origin-based discrimination animated Boeing's decision not to transfer him to the position of offsite material handler while it did transfer Carlin and Newman. Although the District Court noted that Noel had established a prima facie case of discrimination, it nonetheless granted judgment in Defendants' favor because Boeing successfully rebutted that case. Specifically, the District Court found credible Boeing's assertion that the sole reason Carlin and Newman were sent offsite to work as material handlers was because they were the "only employees who directly expressed interest in and volunteered for the jobs and that in doing so, it followed the Collective Bargaining Agreement guidelines to the letter. . . . As [Noel] himself acknowledges, he never sought to have another job in Amarillo other than the one which he was then performing – mechanic." (App. at 39-40.) Thus, the District Court granted judgment in Defendants' favor because Noel did not "convince" it that Boeing's stated reason for moving Carlin and Newman offsite was false and "that discrimination was the real reason for the decision." (*Id.* at 40.)[3]

---

[3] Though not relevant to this appeal, the District Court also granted judgment in Defendants' favor on Noel's retaliation and hostile work environment claims. (App. at 57.)

## II.

The only aspect of the District Court's ruling that Noel challenges is its determination that he failed to administratively preserve his claim that, in 2003, Defendants failed to promote him to Offsite Mechanic General Labor Grade 11 in violation of Title VII.[4]  According to Noel, because of this discriminatory employment action, he received less pay than his white co-workers throughout his time at the Amarillo plant.  Noel contends that the Lilly Ledbetter Fair Pay Act of 2009 ("FPA")[5] makes clear that "in pay discrimination matters an unlawful employment practice occurs each time an individual is affected by application of a discriminatory compensation decision." Appellant's Br. at 8.  Noel argues that the District Court erred as a matter of law when it granted summary judgment in Defendants' favor since Boeing's failure to promote him resulted in lower pay, and, therefore, each paycheck he received started the administrative clock anew.

---

[4]  We have jurisdiction over Noel's appeal pursuant to 28 U.S.C. § 1291, and our review of a District Court's grant of summary judgment is plenary. *See Mikula v. Allegheny Cnty. of Pa.*, 583 F.3d 181, 185 (3d Cir. 2009) (per curiam).  Summary judgment is granted only if there remains no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[5]  The Fair Pay Act, codified at 42 U.S.C. § 2000e-5(e)(3)(A), was signed into law on January 29, 2009 and made retroactive to May 28, 2007.

Title VII of the 1964 Civil Rights Act makes it unlawful for an employer "to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . or . . . to limit . . . or classify his employees . . . in any way which would deprive . . . any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race . . . or national origin. " 42 U.S.C. § 2000e-2(a)(1)-(2). Before filing a claim in federal court, a Title VII plaintiff in Pennsylvania must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. *See Mikula,* 583 F.3d at 183; 42 U.S.C. § 2000e-5(e)(1). If a claimant fails to exhaust his or her claim within the requisite time period, that claim is administratively barred. This statute of limitations applies to discrete employment actions, including promotion decisions. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

Here, the adverse employment actions Noel complained of occurred between July and September 2003. Because Noel did not file his EEOC charge until March 25, 2005, well after the 300-day time period expired, the District Court ruled that any claims of discrimination stemming from the 2003 employment decisions were barred as a matter of law. Nevertheless, Noel argues that the FPA revives his claim since each paycheck he received during the requisite time period started the administrative clock ticking anew.

Congress passed the FPA in response to the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, which held that "pay-setting" was a discrete act and therefore the period for filing an EEOC claim commences when

-8-

the unlawful act occurs. 550 U.S. 618, 621 (2007), *superseded, in part, by statute*, Fair Pay Act of 2009, Pub. L. No. 111-2, 42 U.S.C. § 2000e-5(e)(3), *as recognized in Mikula*, 583 F.3d at 183-84, 186. Ledbetter worked for Goodyear from 1979 until 1998; she introduced evidence at trial that throughout her employment, Goodyear supervisors evaluated her poorly because of her sex, resulting in lower pay than if her evaluations had been discrimination-free. *Id.* at 621-22. She further proved that the discriminatory pay decisions negatively affected her pay throughout the course of her employment, resulting in a salary that was significantly lower than that of her male peers. *Id.* at 622. Although a jury found in Ledbetter's favor and awarded her backpay and damages, the Supreme Court affirmed the circuit court's reversal, ruling that "[t]he EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." *Id.* at 628. In so holding, the Court noted that "it is not our prerogative to change the way in which Title VII balances the interests of aggrieved employees against the interest in encouraging the prompt processing of all charges of employment discrimination and the interest in repose." *Id.* at 642 (internal citation & quotation marks omitted). That prerogative lies with Congress, which answered swiftly by passing the FPA.

The Lilly Ledbetter Fair Pay Act amended Title VII by adding the following section:

> [A]n unlawful employment practice occurs, with respect to discrimination in compensation in

violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e-5(e)(3)(A). The purpose of the FPA "was to reinstate the law regarding the timeliness of pay compensation claims as it was prior to the *Ledbetter* decision, which Congress believed undermined statutory protections against compensation discrimination by unduly restricting the time period in which victims could challenge and recover for discriminatory compensation decisions." *Mikula*, 583 F.3d at 184. Thus, pursuant to the FPA, each paycheck that stems from a discriminatory compensation decision or pay structure is a tainted, independent employment-action that commences the administrative statute of limitations.

Noel contends that the FPA revives his otherwise administratively time-barred claims because the "Court's assertion that [his] filing of his EEOC charge . . . is outside of the filing period . . . is based on the erroneous conclusion that the 300 day period started upon the act of failing to grant him a promotion/raise in Amarillo . . . in the spring of 2003." Appellant's Br. at 8-9. According to Noel, "Boeing's discrimination in refusing to give [him] a raise to Labor Grade 11 while giving this grade to similarly situated white co-workers . . . was perpetuated each time the resulting lower compensation was thereafter paid to" him, bringing his claim squarely within the FPA. *Id.* at 12.

Before addressing Noel's argument that the FPA

-10-

retroactively renders his March 2005 EEOC filing timely, we must first determine whether he actually alleged pay discrimination in connection with Boeing's failure to promote him in 2003. Noel assigns error to the District Court's determination that the 300-day filing period commenced "upon the act of failing to grant him a promotion/raise in Amarillo . . . in the spring of 2003." Appellant's Br. at 9. He styles his failure-to-promote claim as a pay-setting claim by connecting "promotion" and "raise," and by asserting that Boeing's purportedly discriminatory act was "refusing to give [him] a raise to Labor Grade 11." *Id.* This claim is unpersuasive, however, since Noel did not plead or claim a nexus between his promotion claim and the resultant lower salary before the District Court. To the contrary, nowhere in Noel's Amended Complaint does he make any allegations of disparate compensation during the relevant period. *See* Compl. ¶¶ 11-13 (App. at 68) (describing the desirability of offsite assignments and accusing Boeing in 2002 of sending white co-workers offsite and passing him over). Rather, his factual allegations were focused on Boeing's allegedly discriminatory failure to promote him while advancing his white co-workers.

Indeed, Noel did not raise the specter of compensation until he reaches the events of 2005. *See* Compl. ¶¶ 23-26 (App. at 69.) And even then, he only discussed compensation in the context of disparate pay rates for offsite versus Ridley Park jobs, and not as unequal pay for performance of the same job. Nor did he attempt to connect his promotion claim to a compensation claim in his opposition to Boeing's motion for summary judgment. (App. at 132-34.) Rather, Noel argued that his failure to file an EEOC complaint within 300 days of his promotion denial was not fatal pursuant to the continuing violations theory. (*Id.* at 131-32.) Again, he claimed no nexus between Boeing's decision not to promote him and any resultant disparate compensation.

Nor did Noel allege that he received less pay than his white peers for work performed at the same grade level. Rather, he consistently and forcefully argued that he was unlawfully passed over for promotion while his white co-workers were advanced. To be sure, in his Federal Rule of Civil Procedure 52(b) motion, Noel noted that because his white co-workers were promoted to Labor Grade 11, they received more pay than he did. (*Id.* at 444-45.) This does not, however, transform his failure-to-promote claim into a discrimination-in-compensation claim. Because his white co-workers were at a higher pay grade they necessarily received an elevated salary. Throughout this litigation, Noel never argued that he was denied equal pay for equal work. At best he attempts to connect his lack of promotion with the resulting lower salary for the first time on appeal. Therefore, we conclude that despite Noel's protestations to the contrary, he grieved a failure-to-promote claim and not a discrimination-in-compensation claim.

Having determined that Noel actually pled a failure-to-promote claim, we address an issue of first impression in this circuit: whether, under the FPA, a failure-to-promote claim constitutes "discrimination in compensation." Only one other circuit has addressed this issue.

The D.C. Circuit recently held that the FPA's terms do not cover failure-to-promote grievances. *See Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 375 (D.C. Cir. 2010). In *Schuler*, the plaintiff brought an Age Discrimination in Employment Act ("ADEA") complaint against his employer for failure to promote him to partner. *Id.* at 373. The district court dismissed it as administratively barred. Like Noel, Schuler on appeal argued that the FPA rendered his failure-to-promote claims timely. *Id.* at 374. The D.C. Circuit rejected this argument, noting first that "[t]here can be no dispute that in order to benefit from the [FPA, plaintiff] must bring a claim involving 'discrimination in compensation' and point to a

-12-

'discriminatory compensation decision or other practice.'" *Id.* The court next noted that in employment law, "'discrimination in compensation' means paying different wages or providing different benefits to similarly situated employees, not promoting one employee but not another to a more remunerative position." *Id.* (citing *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999)). In turn, the D.C. Circuit concluded that in "context, therefore, we do not understand 'compensation decision or other practice' to refer to the decision to promote one employee but not another to a more remunerative position." *Id.* at 375.

We note, as did the D.C. Circuit, that the FPA was enacted with the specific intent to overrule the Supreme Court's *Ledbetter* decision, and the issue in that case was confined to pay discrimination. The FPA's focus on compensation decisions is evidenced by the "findings" section of the statute, which states:

> The Supreme Court['s decision in *Ledbetter*] significantly impairs statutory protections against discrimination in compensation that Congress established and that have been bedrock principles of American law for decades. The *Ledbetter* decision undermines those statutory protections by unduly restricting the time period in which victims of discrimination can challenge and recover for discriminatory compensation decisions or other practices, contrary to the intent of Congress. . . . The limitation imposed by the Court on the filing of discriminatory compensation claims ignores the reality of wage discrimination . . . .

Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, § 2, 123 Stat. 5 (2009). In our view, Congress' motivation for enacting the FPA was to overturn the perceived harshness of *Ledbetter* and to provide greater protection against wage

-13-

discrimination but not other types of employment discrimination. This intention is evidenced by Congress' use of the term "compensation," repeated five times throughout the Act, indicating that the driving force behind the FPA was remedying wage discrimination.[6]

On the basis of a plain and natural reading, we conclude that the FPA does not apply to failure-to-promote claims. As noted above, the FPA states that "[f]or purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted." 42 U.S.C. § 2000e-5(e)(3)(A). This first clause of § 2000e-5(e)(3)(A) limits the scope of the Lilly Ledbetter Amendment by defining "unlawful employment practice" vis-a-vis "discrimination in compensation" violations. It then further confines its applicability to situations in which "a discriminatory compensation decision or other practice is adopted." Thus, the plain language of the FPA covers compensation decisions and not other discrete employment decisions.

This textual analysis is reinforced by our treatment of compensation-related claims and failure-to-promote claims as distinct grievances that are not coextensive. To maintain a pay disparity claim, a plaintiff must demonstrate that "employees .

---

[6] This interpretation does not render the phrase "or other practice" superfluous. These words merely indicate that in order to fall within the ambit of the FPA, the discriminatory "other practice," while not actually setting a disparate remuneration level, must relate to pay disparity. *See Schuler*, 595 F.3d at 375 (noting that "giving an employee a poor performance evaluation based upon her sex . . . and then using the [unlawful] evaluation to determine her rate of pay" constitutes "an other practice" within the meaning of the FPA).

. . were paid differently for performing 'equal work'–work of substantially equal skill, effort and responsibility, under similar working conditions." *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000) (citation omitted). A failure-to-promote claim, however, requires a Title VII plaintiff to show "(i) that he belongs to a [protected category]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Our sister circuits also treat these types of discrimination claims as distinct causes of action, requiring different elements. *See Schuler*, 595 F.3d at 374-75 (collecting cases). It is well understood that "Congress is aware of a judicial interpretation of statutory language." *Nequsie v. Holder,* 129 S. Ct. 1159, 1181, – U.S. –, (2009); *see also Pope by Pope v. E. Brunswick Bd. of Educ.*, 12 F.3d 1244, 1249 (3d Cir. 1993) ("Congress [is] presumed to know the meanings of the words and phrases it uses in drafting statutes."). Congress was undoubtedly aware that courts have universally treated pay-setting and failure-to-promote claims as different causes of action. Had Congress intended the FPA to cover types of employment discrimination claims apart from pay discrimination claims, it would have done so explicitly.

Like the D.C. Circuit, we also note that our decision is consistent with Congress' intent when it passed the FPA. In her dissenting opinion in *Ledbetter*, Justice Ginsburg distinguished between compensation decisions and other employment decisions, noting that "[p]ay disparities are . . . significantly different from adverse actions such as termination, failure to promote, . . . or refusal to hire, all involving fully communicated discrete acts, easy to identify as discriminatory." *Ledbetter*, 550 U.S. at 645 (Ginsburg, J., dissenting) (internal quotation marks omitted). Unlike the discrete employment acts identified by

-15-

Justice Ginsburg, which are readily apparent since an individual will know when (s)he has been hired, fired, or promoted, compensation decisions are often cloaked in secrecy, and an employee may not know how much his or her co-workers earn. *See id.* at 649 (Ginsburg, J., dissenting) ("A worker knows immediately if she is denied a promotion . . . . And promotions . . . are generally public events, known to co-workers. When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext. Compensation disparities, in contrast, are often hidden from sight."). Thus, the FPA was enacted to address a particular type of employment discrimination, compensation decisions, which are often concealed and not discovered until long after the 180- or 300-day administrative period expires. There is no indication, however, that Congress intended the FPA to apply to discrete employment decisions, like promotion decisions, and Noel cites no authority for that proposition.

Noel's reliance on our holding in *Mikula* does not alter this conclusion. In *Mikula* the plaintiff sued the Allegheny County Police Department for gender discrimination based on its failure to give her a pay raise. 583 F.3d at 182. Mikula alleged that she repeatedly asked for pay increases but received no response from her employer. While we initially upheld the grant of summary judgment in the defendant's favor since her suit was administratively time-barred, we granted rehearing to determine the effect of the FPA on Mikula's claim and ultimately remanded to the district court. *Id.* at 182, 186. In doing so, we held that "the failure to answer a request for a raise qualifies as a compensation decision because the result is the same as if the request had been explicitly denied." *Id.* at 186.

Noel contends that the same logic applies here, since Boeing's failure to promote him resulted in lower compensation. This argument misses the mark. We recognize

that many employment-related decisions, not simply pay-setting decisions, ultimately have some effect on compensation. But to include these myriad employment decisions within the "other practice" language of the FPA would weaken Title VII's administrative exhaustion requirement. Indeed, the expansive interpretation of "other practice" advanced by Noel would potentially sweep all employment decisions under the "other practice" rubric.

Furthermore, there is well-established Supreme Court precedent holding that discrete employment acts trigger the administrative clock at the time the employment decisions occur. *See Morgan*, 536 U.S. at 113-14. Had Congress intended to abrogate § 2000e-5(e)(1) and overturn *Morgan*, it would have done so explicitly and not by implication. *See Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 109 (1991) (reaffirming "the kindred rule that legislative repeals by implication will not be recognized, insofar as two statutes are capable of coexistence, absent a clearly expressed congressional intention to the contrary") (citation & internal quotation marks omitted)). Indeed, in § 2 of the FPA, Congress explicitly mentioned that the *Ledbetter* decision was the driving force behind enacting the Lilly Ledbetter Amendment to Title VII. Congress did not, however, cite to *Morgan* with displeasure. We will therefore not expand the meaning of "other practice" such that it swallows whole Title VII's exhaustion requirement and overturns settled Supreme Court precedent.

In sum, because Noel filed his failure-to-promote discrimination charge with the EEOC outside of the 300-day period, and because a failure-to-promote claim is not a discrimination-in-compensation charge within the meaning of the FPA, we affirm the District Court's Order granting Boeing summary judgment.

## III.

For the foregoing reasons, we will affirm the District Court's grant of Judgment on Partial Findings in Defendants' favor.