(Slip Opinion)　　　　OCTOBER TERM, 2015　　　　1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GREEN *v.* BRENNAN, POSTMASTER GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 14–613.　Argued November 30, 2015—Decided May 23, 2016

After petitioner Marvin Green complained to his employer, the United States Postal Service, that he was denied a promotion because he was black, his supervisors accused him of the crime of intentionally delaying the mail. In an agreement signed December 16, 2009, the Postal Service agreed not to pursue criminal charges, and Green agreed either to retire or to accept another position in a remote location for much less money. Green chose to retire and submitted his resignation paperwork on February 9, 2010, effective March 31.

On March 22—41 days after resigning and 96 days after signing the agreement—Green reported an unlawful constructive discharge to an Equal Employment Opportunity counselor, an administrative prerequisite to filing a complaint alleging discrimination or retaliation in violation of Title VII of the Civil Rights Act of 1964. See 29 CFR §1614.105(a)(1). Green eventually filed suit in Federal District Court, which dismissed his complaint as untimely because he had not contacted the counselor within 45 days of the "matter alleged to be discriminatory," *ibid.* The Tenth Circuit affirmed, holding that the 45-day limitations period began to run on December 16, the date Green signed the agreement.

*Held*:

1. Because part of the "matter alleged to be discriminatory" in a constructive-discharge claim is an employee's resignation, the 45-day limitations period for such action begins running only after an employee resigns. Pp. 4–15.

(a) Where, as here, the regulatory text itself is not unambiguously clear, the Court relies on the standard rule for limitations periods, which provides that a limitations period ordinarily begins to run "'when the plaintiff has a complete and present cause of action,'"

Syllabus

*Graham County Soil & Water Conservation Dist.* v. *United States ex rel. Wilson*, 545 U. S. 409, 418. Applied here, that rule offers three persuasive reasons to include the employee's resignation in the limitations period. Pp. 4–10.

(i) First, resignation is part of the "complete and present cause of action" in a constructive-discharge claim, which comprises two basic elements: discriminatory conduct such that a reasonable employee would have felt compelled to resign and actual resignation, *Pennsylvania State Police* v. *Suders*, 542 U. S. 129, 148. Until he resigns, an employee does not have a "complete and present cause of action" for constructive discharge. Under the standard rule, only after the employee has a complete and present cause of action does that trigger the limitations period. In this respect, a constructive-discharge claim is no different from an ordinary wrongful-discharge claim, which accrues only after the employee is fired. Pp. 6–8.

(ii) Second, although the standard rule may be subject to exception where clearly indicated by the text creating the limitations period, nothing in Title VII or the regulation suggests such displacement. To the contrary, it is natural to read "matter alleged to be discriminatory" as including the allegation forming the basis of the claim, which confirms the standard rule's applicability. Pp. 8–9.

(iii) Third, practical considerations also confirm the merit of applying the standard rule. Starting the clock ticking before a plaintiff can actually file suit does little to further the limitations period's goals and actively negates Title VII's remedial structure. A "limitations perio[d] should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes." *Delaware State College* v. *Ricks*, 449 U. S. 250, 262, n. 16. Nothing in the regulation suggests a two-step process in which an employee would have to file a complaint after an employer's discriminatory conduct, only to be forced to amend that complaint to allege constructive discharge after resigning. Requiring that a complaint be filed before resignation occurs would also, *e.g.,* ignore that an employee may not be in a position to leave his job immediately. Pp. 9–10.

(b) Arguments against applying the standard rule here are rejected. *Suders* stands not for the proposition that a constructive discharge is tantamount to a formal discharge for remedial purposes only, but for the rule that constructive discharge is a claim distinct from the underlying discriminatory act, 542 U. S., at 149. Nor was Green's resignation the mere inevitable consequence of the Postal Service's discriminatory conduct. *Ricks*, 449 U. S. 250, distinguished. Finally, the important goal of promoting conciliation through early, informal contact with a counselor does not warrant treating a constructive dis-

Syllabus

charge different from an actual discharge for purposes of the limitations period. Pp. 10–15.

    2. A constructive-discharge claim accrues—and the limitations period begins to run—when the employee gives notice of his resignation, not on the effective date thereof. The Tenth Circuit is left to determine, in the first instance, the date that Green in fact gave notice. P. 16.

760 F. 3d 1135, vacated and remanded.

    SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined. ALITO, J., filed an opinion concurring in the judgment. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–613

_____

## MARVIN GREEN, PETITIONER *v.* MEGAN J. BRENNAN, POSTMASTER GENERAL

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[May 23, 2016]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. §2000e *et seq.*, prohibits employers from discriminating on the basis of race, color, religion, sex, or national origin, or retaliating against their employees for opposing or seeking relief from such discrimination. Before a federal civil servant can sue his employer for violating Title VII, he must, among other things, "initiate contact" with an Equal Employment Opportunity counselor at his agency "within 45 days of the date of the matter alleged to be discriminatory." 29 CFR §1614.105(a)(1) (2015).

If an employee claims he has been fired for discriminatory reasons, the "matter alleged to be discriminatory" includes the discharge itself and the 45-day limitations period begins running only after the employee is fired.

We address here when the limitations period begins to run for an employee who was not fired, but resigns in the face of intolerable discrimination—a "constructive" discharge. We hold that, in such circumstances, the "matter alleged to be discriminatory" includes the employee's

resignation, and that the 45-day clock for a constructive discharge begins running only after the employee resigns.

I

We recite the following facts in the light most favorable to petitioner Marvin Green, against whom the District Court entered summary judgment. Green is a black man who worked for the Postal Service for 35 years. In 2008, he was serving as the postmaster for Englewood, Colorado when he applied for a promotion to the vacant postmaster position in nearby Boulder. He was passed over. Shortly thereafter, Green complained he was denied the promotion because of his race.

Green's relations with his supervisors crumbled following his complaint. Tensions peaked on December 11, 2009, when two of Green's supervisors accused him of intentionally delaying the mail—a criminal offense. See 18 U. S. C. §1703. They informed Green that the Postal Service's Office of the Inspector General (OIG) was investigating the charge and that OIG agents had arrived to interview him as part of their investigation. After Green met with the OIG agents, his supervisors gave him a letter reassigning him to off-duty status until the matter was resolved. Even though the OIG agents reported to Green's supervisors that no further investigation was warranted, the supervisors continued to represent to Green that "the OIG is all over this" and that the "criminal" charge "could be a life changer." App. 53.

On December 16, 2009, Green and the Postal Service signed an agreement whose meaning remains disputed. Relevant here, the Postal Service promised not to pursue criminal charges in exchange for Green's promise to leave his post in Englewood. The agreement also apparently gave Green a choice: effective March 31, 2010, he could either retire or report for duty in Wamsutter, Wyoming— population 451—at a salary considerably lower than what

he earned in his Denver suburb. Green chose to retire and submitted his resignation to the Postal Service on February 9, 2010, effective March 31.

On March 22—41 days after submitting his resignation paperwork to the Postal Service on February 9, but 96 days after signing the settlement agreement on December 16—Green contacted an Equal Employment Opportunity (EEO) counselor to report an unlawful constructive discharge. He contended that his supervisors had threatened criminal charges and negotiated the resulting agreement in retaliation for his original complaint.[1] He alleged that the choice he had been given effectively forced his resignation in violation of Title VII.

Green eventually filed suit in the Federal District Court for the District of Colorado, alleging, *inter alia*, that the Postal Service constructively discharged him. The Postal Service moved for summary judgment, arguing that Green had failed to make timely contact with an EEO counselor within 45 days of the "matter alleged to be discriminatory," as required by 29 CFR §1614.105(a)(1). The District Court granted the Postal Service's motion for summary judgment.

The Tenth Circuit affirmed, holding that the "matter alleged to be discriminatory" encompassed only the Postal Service's discriminatory actions and not Green's independent decision to resign on February 9. *Green* v. *Donahue*, 760 F. 3d 1135 (2014). Therefore, the 45-day limitations period started running when both parties signed the settlement agreement on December 16, 2009. Accordingly, because 96 days passed between the agreement and when Green contacted an EEO counselor on March 22,

---

[1] We assume without deciding that it is unlawful for a federal agency to retaliate against a civil servant for complaining of discrimination. See *Gómez-Pérez* v. *Potter*, 553 U. S. 474, 488, n. 4 (2008); Brief for Respondent 2.

2010, his constructive-discharge claim was time barred.

Two other Courts of Appeals agree with the Tenth Circuit's view that the limitations period begins to run for a constructive-discharge claim after the employer's last discriminatory act.[2] As the Tenth Circuit recognized, however, other Courts of Appeals have held that the limitations period for a constructive-discharge claim does not begin to run until the employee resigns.[3]

We granted certiorari to resolve this split. 575 U. S. ___ (2015). Because no party here supports the Tenth Circuit's holding that an employee's resignation is not part of the "matter alleged to be discriminatory," we appointed Catherine M. A. Carroll to defend that aspect of the judgment below. 576 U. S. ___ (2015). She has ably discharged her duties and the Court thanks her for her service.

## II

Before a federal civil servant can sue his employer in court for discriminating against him in violation of Title VII, he must first exhaust his administrative remedies. 42 U. S. C. §2000e–16(c). To exhaust those remedies, the Equal Employment Opportunity Commission (EEOC) has promulgated regulations that require, among other things, that a federal employee consult with an EEO counselor prior to filing a discrimination lawsuit. Specifically, he "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective

---

[2] *Mayers* v. *Laborers' Health and Safety Fund of North America*, 478 F. 3d 364, 370 (CADC 2007) (*per curiam*); *Davidson* v. *Indiana-American Water Works*, 953 F. 2d 1058, 1059 (CA7 1992).

[3] *Flaherty* v. *Metromail Corp.*, 235 F. 3d 133, 138 (CA2 2000); *Draper* v. *Coeur Rochester, Inc.*, 147 F. 3d 1104, 1111 (CA9 1998); *Hukkanen* v. *Operating Engineers,* 3 F. 3d 281, 285 (CA8 1993); *Young* v. *National Center for Health Servs. Research*, 828 F. 2d 235, 238 (CA4 1987).

date of the action." 29 CFR §1614.105(a)(1).[4] The timeliness of Green's claim therefore turns on our interpretation of this EEOC regulation implementing Title VII.[5]

Although we begin our interpretation of the regulation with its text, the text in this case is not particularly helpful. Nowhere does §1614.105 indicate whether a "matter alleged to be discriminatory" in a constructive-discharge claim includes the employee's resignation, as Green contends, or only the employer's discriminatory conduct, as *amica* contends. The word "matter" simply means "an allegation forming the basis of a claim or defense," Black's Law Dictionary 1126 (10th ed. 2014)—a term that could readily apply to a discrimination-precipitated resignation. So the "matter alleged to be discriminatory" could refer to all of the allegations underlying a claim of discrimination, including the employee's resignation, or only to those allegations concerning the employer's discriminatory conduct. We therefore must turn to other canons of interpretation.

The most helpful canon in this context is "the 'standard rule'" for limitations periods. *Graham County Soil & Water Conservation Dist.* v. *United States ex rel. Wilson*, 545 U. S. 409, 418 (2005). Ordinarily, a "'limitations period commences when the plaintiff has a complete and present cause of action.'" *Ibid.* "[A] cause of action does not become 'complete and present' for limitations purposes

——————

[4] This regulation, applicable to federal employees only, has a statutory analog for private-sector Title VII plaintiffs, who are required to file a charge with the EEOC within 180 or 300 days "after the alleged unlawful employment practice occurred." 42 U. S. C. §2000e–5(e)(1). Although the language is different, the EEOC treats the federal and private-sector employee limitations periods as identical in operation. See EEOC Compliance Manual: Threshold Issues §2–IV(C)(1), n. 179.

[5] Green does not contend that his alleged constructive discharge is a "personnel action." See Brief for Petitioner 17–18; *Green* v. *Donahoe*, 760 F. 3d 1135, 1144, n. 3 (CA10 2014). We therefore address the "matter alleged to be discriminatory" clause only.

until the plaintiff can file suit and obtain relief." *Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U. S. 192, 201 (1997). Although the standard rule can be displaced such that the limitations period begins to run before a plaintiff can file a suit, we "will not infer such an odd result in the absence of any such indication" in the text of the limitations period. *Reiter* v. *Cooper*, 507 U. S. 258, 267 (1993).

Applying this default rule, we are persuaded that the "matter alleged to be discriminatory" in a constructive-discharge claim necessarily includes the employee's resignation for three reasons. First, in the context of a constructive-discharge claim, a resignation is part of the "complete and present cause of action" necessary before a limitations period ordinarily begins to run. Second, nothing in the regulation creating the limitations period here, §1614.105, clearly indicates an intent to displace this standard rule. Third, practical considerations confirm the merit of applying the standard rule here. We therefore interpret the term "matter alleged to be discriminatory" for a constructive-discharge claim to include the date Green resigned.

A

The standard rule for limitations periods requires us first to determine what is a "complete and present cause of action" for a constructive-discharge claim. We hold that such a claim accrues only after an employee resigns.

The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police* v. *Suders*, 542 U. S. 129, 141 (2004). When the employee resigns in the face of such circumstances, Title VII treats that resignation as tanta-

mount to an actual discharge. *Id.,* at 142–143.

A claim of constructive discharge therefore has two basic elements. A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. *Id.,* at 148. But he must also show that he actually resigned. *Ibid.* ("A constructive discharge involves *both* an employee's decision to leave and precipitating conduct . . ." (emphasis added)). In other words, an employee cannot bring a constructive-discharge claim until he is constructively *discharged.* Only after both elements are satisfied can he file suit to obtain relief.

Under the standard rule for limitations periods, the limitations period should begin to run for a constructive-discharge claim only after a plaintiff resigns. At that point—and not before—he can file a suit for constructive discharge. So only at that point—and not before—does he have a "complete and present" cause of action. And only after he has a complete and present cause of action does a limitations period ordinarily begin to run. Cf. *Mac's Shell Service, Inc.* v. *Shell Oil Products Co.*, 559 U. S. 175, 189–190 (2010) (the limitations period for a constructive termination of a franchise agreement starts running when the agreement is constructively terminated).

In this respect, a claim that an employer constructively discharged an employee is no different from a claim that an employer actually discharged an employee. An ordinary wrongful discharge claim also has two basic elements: discrimination and discharge. See *St. Mary's Honor Center* v. *Hicks*, 509 U. S. 502, 506 (1993); 1 B. Lindemann, P. Grossman, & C. Weirich, Employment Discrimination Law 21–33 (5th ed. 2012) (Lindemann) ("The sine qua non of a discharge case is, of course, a discharge"). The claim accrues when the employee is fired. At that point—and not before—he has a "complete and present cause of action." So at that point—and not

before—the limitations period begins to run.

With claims of either constructive discharge or actual discharge, the standard rule thus yields the same result: a limitations period should not begin to run until after the discharge itself. In light of this rule, we interpret the term "matter alleged to be discriminatory" in §1614.105 to refer to all of the elements that make up a constructive-discharge claim—including an employee's resignation.

## B

Although the standard rule dictates that a limitations period should commence only after a claim accrues, there is an exception to that rule when the text creating the limitations period clearly indicates otherwise. See, *e.g., Dodd* v. *United States*, 545 U. S. 353, 360 (2005). Nothing in the text of Title VII or the regulation, however, suggests that the standard rule should be displaced here. To the contrary, the language of the regulation confirms our application of the default rule.

As noted previously, the word "matter" generally refers to "an allegation forming the basis of a claim or defense." Black's Law Dictionary 1126. The natural reading of "matter alleged to be discriminatory" thus refers to the allegation forming the basis of the discrimination claim— here, a claim of constructive discharge. And as discussed above, a constructive discharge claim requires two basic allegations: discriminatory conduct by the employer that leads to resignation of the employee. So long as those acts are part of the same, single claim under consideration, they are part of the "matter alleged to be discriminatory," whatever the role of discrimination in each individual element of the claim. Cf. *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 115–121 (2002) (holding that a hostile-work-environment claim is a single "unlawful employment practice" that includes every act composing that claim, whether those acts are inde-

pendently actionable or not).

## C

Finally, we are also persuaded that applying the standard rule for limitations periods to constructive discharge makes a good deal of practical sense. Starting the limitations clock ticking *before* a plaintiff can actually sue for constructive discharge serves little purpose in furthering the goals of a limitations period—and it actively negates Title VII's remedial structure. Cf. *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385, 398 (1982) (holding that the Title VII limitations period should be construed to "honor the remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement").

This Court has recognized "that the limitations perio[d] should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes." *Delaware State College* v. *Ricks*, 449 U. S. 250, 262, n. 16 (1980). If the limitations period begins to run following the employer's precipitating discriminatory conduct, but before the employee's resignation, the employee will be forced to file a discrimination complaint after the employer's conduct and later amend the complaint to allege constructive discharge after he resigns. Nothing in the regulation suggests it intended to require a layperson, while making this difficult decision, to follow such a two-step process in order to preserve any remedy if he is constructively discharged.

Moreover, forcing an employee to lodge a complaint before he can bring a claim for constructive discharge places that employee in a difficult situation. An employee who suffered discrimination severe enough that a reasonable person in his shoes would resign might nevertheless force himself to tolerate that discrimination for a period of time. He might delay his resignation until he can afford to

leave. Or he might delay in light of other circumstances, as in the case of a teacher waiting until the end of the school year to resign. Tr. 17. And, if he feels he must stay for a period of time, he may be reluctant to complain about discrimination while still employed. A complaint could risk termination—an additional adverse consequence that he may have to disclose in future job applications.

## III

*Amica* and the dissent read "matter alleged to be discriminatory" as having a clear enough meaning to displace our reliance on the standard rule for limitations periods. They argue that "matter" is not equivalent to "claim" or "cause of action," and that the use of the phrase "matter alleged to be discriminatory" is a sufficiently clear statement that the standard claim accrual rule should not apply. According to *amica* and the dissent, "matter" refers only to the discriminatory acts of the Postal Service, not Green's resignation.

We disagree. There is nothing inherent in the phrase "matter alleged to be discriminatory" that clearly limits it to employer conduct. Rather, as discussed above, the term can reasonably be interpreted to include the factual basis for a claim. Green is not alleging just that the Postal Service discriminated against him. He claims that the discrimination left him no choice but to resign.

*Amica* and the dissent dispute that a constructive discharge is a separate claim. According to *amica* and the dissent, the constructive-discharge doctrine merely allows a plaintiff to expand any underlying discrimination claim to include the damages from leaving his job, thereby increasing his available remedies. See 1 Lindemann 21–49 (constructive discharge allows plaintiff to seek backpay, front pay, or reinstatement). In support of this argument, *amica* and the dissent emphasize this Court's statement in *Suders* that "[u]nder the constructive discharge doctrine,

an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge *for remedial purposes*." 542 U. S., at 141 (emphasis added); see also *id.*, at 148 ("[A] constructive discharge is functionally the same as an actual termination in damages-enhancing respects").

But the Court did not hold in *Suders* that a constructive discharge is tantamount to a formal discharge for remedial purposes exclusively. To the contrary, it expressly held that constructive discharge is a claim distinct from the underlying discriminatory act. *Id.,* at 149 (holding that a hostile-work-environment claim is a "lesser included component" of the "*graver* claim of hostile-environment constructive discharge"). This holding was no mere dictum. See *id.,* at 142 ("[A] claim for constructive discharge lies under Title VII"). We see no reason to excise an employee's resignation from his constructive-discharge claim for purposes of the limitations period.

The concurrence sets out a theory that there are two kinds of constructive discharge for purposes of the limitations period: constructive discharge "claims" where the employer "makes conditions intolerable *with the specific discriminatory intent of forcing the employee to resign*," and constructive discharge "damages" where the employer does not intend to force the employee to quit, but the discriminatory conditions of employment are so intolerable that the employee quits anyway. *Post,* at 6–11 (ALITO, J., concurring in judgment). According to the concurrence, the limitations period does not begin to run until an employee resigns under the "claim" theory of constructive discharge, but begins at the last discriminatory act before resignation under the "damages" theory.

This sometimes-a-claim-sometimes-not theory of constructive discharge is novel and contrary to the constructive discharge doctrine. The whole point of allowing an employee to claim "constructive" discharge is that in cir-

cumstances of discrimination so intolerable that a reason-
able person would resign, we treat the employee's resigna-
tion as though the employer actually fired him. *Suders*,
542 U. S., at 141–143.[6] We do not also require an em-
ployee to come forward with proof—proof that would often
be difficult to allege plausibly—that not only was the dis-
crimination so bad that he had to quit, but also that his
quitting was his employer's plan all along.

*Amica* and the dissent also argue that their interpreta-
tion is more consistent with this Court's prior precedent
on when the limitations period begins to run for discrimi-
nation claims. Under their interpretation, Green's resig-
nation was not part of the discriminatory "matter," but
was instead the mere inevitable consequence of the Postal
Service's discriminatory conduct, and therefore cannot be
used to extend the limitations period. See Brief for Court-
Appointed *Amica Curiae* in Support of Judgment Below

---

[6] The concurrence suggests that its theory is consistent with state-
ments in the *Suders* opinion that constructive discharge is akin to an
actual discharge "'for remedial purposes'" and in "'damages-enhancing
respects.'" *Post,* at 10 (opinion of ALITO, J.) (quoting *Suders*, 542 U. S.,
at 141, 148). This ignores the more obvious explanation for this qualifi-
cation: The Court was distinguishing between the merits of a claim of
constructive discharge generally, where resignation is imputed as a
discriminatory act of the employer, and the affirmative defense avail-
able to an employer in a hostile work environment claim specifically,
which allows an employer to defend against a hostile work environment
claim in certain circumstances if it took no "'official act'" against the
employee. *Id.,* at 143–146. The Court in *Suders* recognized that it
would be bizarre to always impute resignation as an "official act" of the
employer in a constructive discharge hostile work environment case
and prohibit the employer from relying on the no-"official-act" defense,
because it would make it easier to prove the "graver" claim of a con-
structive discharge hostile work environment than to prove a hostile
work environment claim. *Id.,* at 148–149. Thus, the Court declined to
hold that resignation in a constructive discharge case was categorically
an "official act" in all instances. *Ibid.* In other words, the Court sought
a measure of parity between constructive discharge and ordinary
discrimination—parity that we extend to the limitations period here.

21–27 (Brief for *Amica Curiae*) (citing *Ledbetter* v. *Good-year Tire & Rubber Co.*, 550 U. S. 618 (2007), overruled by statute, Lilly Ledbetter Fair Pay Act of 2009, 123 Stat. 5; *Delaware State College* v. *Ricks*, 449 U. S. 250; *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553 (1977)); *post,* at 3–7 (THOMAS, J., dissenting) (citing *Ricks*, 449 U. S. 250, and *Chardon* v. *Fernandez*, 454 U. S. 6 (1981) (*per curiam*)). Similarly, the concurrence argues these cases require that an act done with discriminatory intent must occur within the limitations period. *Post,* at 4 (opinion of ALITO, J.).

But these cases are consistent with the standard rule that a limitations period begins to run after a claim accrues, not after an inevitable consequence of that claim. In *Ricks*, for example, the Court considered the discrimination claim of a college faculty member who was denied tenure and given a 1-year "'terminal'" contract for his last year teaching. 449 U. S., at 258. The plaintiff's claim accrued—and he could have sued—when the college informed him he would be denied tenure and gave him "explicit notice that his employment would end" when his 1-year contract expired. *Ibid.* The Court held that the limitations period began to run on that date, and not after his 1-year contract expired. That final year of teaching was merely an inevitable consequence of the tenure denial the plaintiff claimed was discriminatory.

Green's resignation, by contrast, is not merely an inevitable consequence of the discrimination he suffered; it is an essential part of his constructive-discharge claim. That is, Green could not sue for constructive discharge until he actually resigned. Of course, Green could not resign and then wait until the consequences of that resignation became most painful to complain. For example, he could not use the date of the expiration of his health insurance after his resignation to extend the limitations period. But the "inevitable consequence" principle of *Ricks*, *Ledbetter*, and *Evans* does not change the focus of the limitations period,

which remains on the claim of discrimination itself. See *Lewis* v. *Chicago*, 560 U. S. 205, 214 (2010) (holding *Evans* and its progeny "establish only that a Title VII plaintiff must show a present violation within the limitations period" (internal quotation marks omitted)); *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S., at 115–121 (holding limitations period for hostile-work-environment claim runs from the last act composing the claim).[7] For a constructive discharge, the claim does not exist until the employee resigns.

Finally, *amica* contends that her interpretation of the regulation better advances the EEOC's goal of promoting conciliation for federal employees through early, informal contact with an EEO counselor. See Exec. Order No. 11478, §4, 34 Fed. Reg. 12986 (1969) (counseling for federal employees "shall encourage the resolution of employee problems on an informal basis"). The dissent suggests that our holding will make a discrimination victim the master of his complaint, permitting him to "'exten[d] the limitation[s period] indefinitely'" by waiting to resign. *Post,* at 7 (opinion of THOMAS, J.). The concurrence claims that an employee who relies on the limitations period in waiting

---

[7]The dissent relies on *Morgan*'s other holding that, unlike a hostile-work-environment claim that may comprise many discriminatory acts, discrete claims of discrimination based on independent discriminatory acts cannot be aggregated to extend the limitations period. See *post,* at 3 (opinion of THOMAS, J.) (citing 536 U. S., at 109–113). But this just proves the point: The analysis for the limitations period turns on the nature of the specific legal claim at issue. In *Morgan*, the Court noted that even if a claim of discrimination based on a single discriminatory act is time barred, that same act could still be used as part of the basis for a hostile-work-environment claim, so long as one other act that was part of that same hostile-work-environment claim occurred within the limitations period. *Id.,* at 117 ("It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations . . . ").

to resign is "doubly out of luck" if his otherwise-meritorious discrimination claim is time barred and he cannot show the discrimination was so intolerable that it amounted to a constructive discharge. *Post,* at 13 (opinion of ALITO, J.).

These concerns are overblown. *Amica* may be right that it is more difficult to achieve conciliation after an employee resigns. But the same is true for a federal civil servant who is fired by his agency for what the employee believes to be a discriminatory purpose. And neither decision is necessarily permanent—a resignation or a termination may be undone after an employee contacts a counselor. Conciliation, while important, does not warrant treating a constructive discharge different from an actual discharge for purposes of the limitations period.

As for the dissent's fear, we doubt that a victim of employment discrimination will continue to work in an intolerable environment merely because he can thereby extend the limitations period for a claim of constructive discharge. If anything, a plaintiff who wishes to prevail on the merits of his constructive discharge claim has the opposite incentive. A claim of constructive discharge requires proof of a causal link between the allegedly intolerable conditions and the resignation. See 1 Lindemann 21–45, and n. 106.

And as for the concurrence's double-loser concern, no plaintiff would be well advised to delay pursuing what he believes to be a meritorious non-constructive-discharge-discrimination claim on the ground that a timely filed constructive discharge claim could resuscitate other time-lapsed claims. The 45-day limitations period begins running on any separate underlying claim of discrimination when that claim accrues, regardless of whether the plaintiff eventually claims constructive discharge. The limitations-period analysis is always conducted claim by claim.

IV

Our decision that a resignation triggers the limitations period for a constructive-discharge claim raises the question of when precisely an employee resigns. Here, Green and the Government agree that an employee resigns when he gives his employer definite notice of his intent to resign. If an employee gives "two weeks' notice"—telling his employer he intends to leave after two more weeks of employment—the limitations period begins to run on the day he tells his employer, not his last day at work. (This issue was not addressed by the Tenth Circuit and, accordingly, *amica* takes no position on it. See Brief for *Amica Curiae* 42.)

We agree. A notice rule flows directly from this Court's precedent. In *Ricks*, 449 U. S., at 250, and *Chardon* v. *Fernandez*, 454 U. S. 6, the Court explained that an ordinary wrongful-discharge claim accrues—and the limitations period begins to run—when the employer notifies the employee he is fired, not on the last day of his employment. *Ricks*, 449 U. S., at 258–259; *Chardon*, 454 U. S., at 8. Likewise, here, we hold that a constructive-discharge claim accrues—and the limitations period begins to run—when the employee gives notice of his resignation, not on the effective date of that resignation.

One factual issue remains: when exactly Green gave the Postal Service notice of his resignation. The Government argues that Green resigned on December 16, 2009—when he signed the settlement agreement—and that his claim is therefore still time barred. Green argues that he did not resign until February 9, 2010—when he submitted his retirement paperwork—and that his claim is therefore timely. We need not resolve this issue. Having concluded that the limitations period for Green's constructive-discharge claim runs from the date he gave notice of his resignation, we leave it to the Tenth Circuit to determine when this in fact occurred.

Opinion of the Court

\*     \*     \*

For these reasons, we vacate the judgment of the Tenth Circuit and remand the case for further proceedings consistent with this opinion.

*So ordered.*

# SUPREME COURT OF THE UNITED STATES

───────────

No. 14–613

───────────

## MARVIN GREEN, PETITIONER *v.* MEGAN J. BRENNAN, POSTMASTER GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[May 23, 2016]

JUSTICE ALITO, concurring in the judgment.

In its pursuit of a bright-line limitations rule for constructive discharge claims, the Court loses sight of a bedrock principle of our Title VII cases: An act done with discriminatory intent must have occurred within the limitations period. We have repeatedly held that the time to pursue an employment discrimination claim starts running when a discriminatory act occurs, and that a fresh limitations period does not start upon the occurrence of a later nondiscriminatory act—even if that later act carries forward the effects of the earlier discrimination. See, *e.g., United Air Lines, Inc.* v. *Evans*, 431 U. S. 553, 558 (1977); *Delaware State College* v. *Ricks*, 449 U. S. 250, 257–258 (1980); *Chardon* v. *Fernandez*, 454 U. S. 6, 8 (1981) (*per curiam*); *Lorance* v. *AT&T Technologies, Inc.*, 490 U. S. 900, 907–908, 911 (1989); *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 113 (2002); *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618, 628 (2007). Without mentioning this consistent line of precedent, the Court categorically declares that the limitations period for constructive discharge cases starts upon the employee's resignation, no matter when the last discriminatory act occurred. This effectively disposes of the discriminatory-intent requirement.

Rather than jettison our precedent, I would hold that

the limitations period for constructive discharge claims—like all other employment discrimination claims—starts running upon a discriminatory act of the employer. But I would also hold that an employee's resignation can, in many cases, be considered a discriminatory act of the employer. This is so where an employer subjects an employee to intolerable working conditions *with the discriminatory intent to force the employee to resign.* In these circumstances, the employee's consequent resignation is tantamount to an intentional termination by the employer, and so gives rise to a fresh limitations period just as a conventional termination would. Absent such intent, however, the resignation is not an independent discriminatory act but merely a delayed consequence of earlier discrimination. The resignation may be a basis for enhancing damages in a claim brought on the underlying discrimination, but it cannot restart the limitations clock.

In this case, Green presented sufficient evidence that the Postal Service intended to force him to resign when it presented him with a settlement agreement requiring that he either retire or transfer to a distant post office for much less pay. Accordingly, the 45-day window for him to initiate counseling opened when he gave the Postal Service notice of his resignation.

## I
### A

The regulation at issue here requires a federal employee who complains of unlawful discrimination to initiate contact with an Equal Employment Opportunity (EEO) counselor "within 45 days of the date of the matter alleged to be discriminatory." 29 CFR §1614.105(a)(1) (2015). The Court observes that this language "is not particularly helpful" in resolving the question presented, and so it quickly moves on to other considerations. *Ante,* at 5. I think that more can be discerned from the regulation's

text. The Court observes that a "matter" in this context is "an allegation forming the basis of a claim or defense." Black's Law Dictionary 1126 (10th ed. 2014); *ante,* at 5. But the Court fails to plug in the regulation's critical qualifier: The matter must be (alleged to be) *discriminatory*. The phrase "matter alleged to be discriminatory" is thus most fairly read to refer to the allegation *of discrimination* that underlies an employee's claim, not just any fact that supports the claim.

Even if the regulation's text were unclear on this point, the next place I would look is not to a "standard rule" governing limitations periods, as the majority does, *ibid.*, but to the specific limitations rules we apply in other Title VII cases. Private-sector Title VII plaintiffs are required to file a charge with the Equal Employment Opportunity Commission (EEOC) within 180 or 300 days "after the alleged unlawful employment practice occurred." 42 U. S. C. §2000e–5(e)(1); see *Morgan, supra* (construing this statutory provision).[1] Although this language is not identical to the regulation at issue here, nothing in either text requires that they be read as setting different rules. Indeed, the EEOC's Compliance Manual treats them the same—it describes the regulation as requiring federal employees to contact a counselor within 45 days of "the alleged discriminatory employment *practice,*" and it cites *Morgan* as providing the governing standard.[2] We also granted review in this case on the premise that the same

_____

[1] This 180- or 300-day period is often referred to as the "charging" or "filing" period. See, *e.g., Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618, 624 (2007); *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 117 (2002). Because the 45-day period at issue in this case involves initiating counseling rather than filing a charge, for simplicity I refer to all of these periods as "limitations" periods.

[2] EEOC Compliance Manual: Threshold Issues §2–IV(C)(1), and n. 179 (emphasis added), online at http://www.eeoc.gov/policy/docs/threshold.html (as last visited May 20, 2016).

rule would apply to both federal-sector and private-sector Title VII cases: Green's petition and merits brief ask us to decide when the filing period for constructive discharge claims begins as a matter of "federal employment discrimination law" generally, Pet. for Cert. i; Brief for Petitioner i, and the Circuit split he alleges consists primarily of cases in which the limitations period ran from the date of an unlawful employment "practice," see Pet. for Cert. 11–16. The majority, for its part, seems to agree that the same rules should apply in the federal and private sectors, and it too relies on private-sector cases in describing the Circuit split that today's decision is meant to "resolve." *Ante,* at 4–5, and nn. 2–4. The majority's relegation of our Title VII timeliness cases to its rebuttal argument, see *ante,* at 12–14, is thus surprising.

## B

Our Title VII precedents set somewhat different limitations rules for claims based on a discrete act of discrimination (such as termination, failure to hire, or demotion) and claims based on a hostile work environment. I will focus on the former set of rules because Green's resignation was a discrete act that was precipitated by another discrete act—namely, the settlement agreement that required him to retire or transfer to a far-off, lower paying position. For private-sector claims based on discrete acts, the limitations period starts to run on the day the discriminatory act occurred and expires 180 or 300 days later. *Morgan,* 536 U. S., at 110. This means that an act done *with discriminatory intent*—not merely some act bearing on the claim—must have occurred within the limitations period. We therefore held in *Morgan* that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," and that "a time-barred act [cannot] justify filing a charge concerning a termination that was *not independently discriminatory*."

*Id.,* at 113 (emphasis added).

We spoke even more directly to the point in *Ledbetter.* There we described "discriminatory intent" as the "defining element" of a Title VII disparate-treatment claim, 550 U. S*.,* at 624, and held that the plaintiff's claim of pay discrimination was untimely because she did not allege that any "intentionally discriminatory conduct occurred during the [limitations] period," *id.,* at 628. Although the plaintiff had suffered lower pay within the limitations period because of earlier alleged discrimination, we explained that under our precedents a new limitations period "does not commenc[e] upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." *Ibid.* (discussing *Evans*, 431 U. S. 553, *Ricks*, 449 U. S. 250, *Lorance*, 490 U. S. 900, and *Morgan*, *supra*). Relying on nondiscriminatory acts to establish a timely claim, we reasoned, would impermissibly "shift intent from one act (the act that consummates the discriminatory employment practice) to a later act that was not performed with bias or discriminatory motive. The effect of this shift would be to impose liability in the absence of the requisite intent." 550 U. S., at 629. At the same time, we recognized that when multiple acts that are each "intentionally discriminatory" occur, "a fresh violation takes place"—and thus a new limitations period starts running—"when each act is committed." *Id.,* at 628.[3]

---

[3] Congress has since abrogated *Ledbetter*'s precise holding in the context of "discrimination in compensation," Lilly Ledbetter Fair Pay Act of 2009, §3, 123 Stat. 5, codified at 42 U. S. C. §2000e–5(e)(3)(A), but it did not disturb the reasoning of the precedents on which *Ledbetter* was based. Cf. *Ledbetter*, *supra*, at 627, n. 2 (discussing similar amendment abrogating the precise holding of *Lorance* v. *AT&T Technologies, Inc.*, 490 U. S. 900 (1989)).

## C

These principles lead to the following rule for constructive discharge cases: An employee's resignation triggers a fresh limitations period if the resignation itself constitutes an "intentionally discriminatory" act of the employer. In my view, an employee's resignation in the face of intolerable working conditions can be considered a discriminatory act of the employer when the employer makes conditions intolerable *with the specific discriminatory intent of forcing the employee to resign.* If the employer lacks that intent, however, the limitations period runs from the discriminatory act that precipitated the resignation.

This approach reflects the fact that there are two kinds of constructive discharge. Much of the disagreement between the majority and dissent stems from their differing views of the nature of constructive discharge. To the majority, constructive discharge is always a standalone "claim distinct from the underlying discriminatory act." *Ante,* at 11. To JUSTICE THOMAS and the friend of the Court we appointed to defend the judgment below, constructive discharge is never a separate claim, but merely "a counterdefense to an employer's contention that a resignation was voluntary" that allows the resigning employee to recover backpay and other relief unavailable to employees who quit voluntarily. *Post,* at 9. As I see it, each side is partly right. The label "constructive discharge" is best understood to refer to two different (though related) concepts, one a distinct claim and one not. This case requires us to distinguish between the two and to "identify with care the specific employment practice that is at issue." *Ledbetter, supra,* at 624 (citing *Morgan, supra,* at 110–111).

### 1

The first kind of constructive discharge occurs when an employer subjects an employee to intolerable conditions

with the specific discriminatory *intent* of forcing the employee to quit. In this situation, the employer has deliberately terminated the employee—a discrete employment action. The discharge is termed "constructive," however, because it is formally effected by the employee's resignation rather than the employer's pink slip. The termination can nevertheless be considered a discriminatory act of the employer because the employer intends to terminate the employee and—through the imposition of intolerable conditions—forces the employee to "rubberstamp" that decision by resigning. Cf. *Staub* v. *Proctor Hospital*, 562 U. S. 411, 425 (2011) (ALITO, J., concurring in judgment); *id.,* at 419 (majority opinion) ("Animus and responsibility for [an] adverse action can both be attributed to [an] earlier agent . . . if the adverse action is the intended consequence of that agent's discriminatory conduct"). Because the resignation is the "act that consummates the discriminatory employment practice" of terminating the employee, *Ledbetter*, *supra,* at 629, it triggers a fresh limitations period. In such cases, the constructive discharge should, like a formal discharge, be treated as a distinct cause of action—what we might call a proper "constructive discharge claim."

The employer's discriminatory intent sometimes will manifest itself only outside the limitations period. Consider, for example, an employer that demotes an employee (say, from executive to office assistant) for discriminatory reasons and with the intent that the loss of prestige will force the employee to quit. By the time the employee finally cracks and resigns, the discriminatory *demotion* may be outside the limitations window and not independently actionable. But the employer's discriminatory intent to *terminate* the employee can carry forward to the eventual resignation. We recognized this possibility in *Ledbetter*. We explained that a plaintiff generally cannot create a timely Title VII claim by "attach[ing]" the dis-

criminatory intent accompanying an act outside the limi-
tations period to another act that occurred within the
limitations period. 550 U. S., at 625, 629. At the same
time, we acknowledged that "there may be instances
where the elements forming a cause of action"—
discriminatory intent and an employment action—"span
more than 180 days" (that is, the applicable limitations
period). *Id.,* at 631, n. 3. In such a case, we said, the
limitations period would start to run when "the employ-
ment practice was executed," because that is when "[t]he
act and intent had . . . been joined." *Ibid.* Under my
example, then, the employer "forms an illegal discrimina-
tory intent" to terminate the employee at the time of the
demotion, but the termination is not "executed" or "con-
summated" until the employee resigns some time later.
*Ibid.*; *id.,* at 629. Only at that point have the discrimina-
tory intent to terminate and the act of termination been
"joined," and therefore only at that point does the limita-
tions period for the wrongful discharge start to run.

2

The second kind of constructive discharge occurs when
an employer imposes intolerable conditions for discrimina-
tory reasons but does *not* intend to force an employee to
resign. This is quite different from an ordinary discharge
because the critical element of intent is missing. The
resignation cannot be considered an intentionally discrim-
inatory act of the employer because it is not something the
employer deliberately brought about; it is simply a later-
arising consequence of the earlier discrimination. The
resignation thus does not trigger a fresh limitations period
or give rise to a separate cause of action. See *Evans*, 431
U. S., at 558 (A nondiscriminatory act that "gives present
effect to a past act of discrimination" is not actionable);
*Ricks*, 449 U. S., at 258 ("[T]he proper focus is upon the
time of the *discriminatory acts*, not upon the time at which

the *consequences* of the acts became most painful" (internal quotation marks and brackets omitted)); *Ledbetter*, *supra*, at 628 ("A new violation does not occur, and a new [limitations] period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination").

This does not let the employer off the hook. It is still liable for the acts of discrimination that precipitated the resignation, provided that the employee properly and timely challenges them. And in a suit brought on those underlying acts, the resignation—if reasonable—"is assimilated to a formal discharge *for remedial purposes*." *Pennsylvania State Police* v. *Suders*, 542 U. S. 129, 141 (2004) (emphasis added). The resigning employee can recover, as damages for the underlying discrimination, "all damages [that would be] available for formal discharge" but which are normally unavailable to employees who voluntarily quit. *Id.,* at 147, n. 8; see *post*, at 8–9 (THOMAS, J., dissenting). A resignation that is the reasonable but unintended result of the employer's discriminatory acts thus does not lead to a standalone "constructive discharge claim." Instead, it is a basis for increasing damages on the underlying discrimination claim—what we might call a "constructive discharge damages enhancement." See *Suders*, *supra,* at 148 (analogizing constructive discharge to "an actual termination in damages-enhancing respects").[4]

The majority asserts that in *Suders* the Court "expressly held" that constructive discharge is always its own distinct

_____

[4] These enhanced damages would also be available in a suit based on the underlying discrimination where the employer intended to make the employee resign. Intent to force the resignation is necessary to pursue constructive discharge as a separate claim from the underlying discrimination, but it certainly does not prevent an employee from pursuing greater damages for the underlying discrimination on a constructive discharge theory.

claim. *Ante,* at 11. I do not think that the *Suders* Court
would have taken such pains to qualify its statements that
a constructive discharge is akin to an actual termination
"for remedial purposes" and "in damages-enhancing re-
spects," 542 U. S., at 141, 148, had that been its intention.
Nor was it necessary for the Court to resolve whether
constructive discharge is a separate cause of action or
merely a basis for enhancing damages. The majority
observes that *Suders* referred to a "claim" for constructive
discharge. See *ante,* at 11. But the use of that term does
not indicate that constructive discharge is (always) an
independent cause of action any more than stray refer-
ences to a "claim for punitive damages," *e.g., BMW of
North America, Inc.* v. *Gore*, 517 U. S. 559, 564 (1996);
*Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U. S.
52, 58 (1995), mean that punitive damages are actionable
independent of an underlying tort claim.

The majority also asserts that intent to cause a resigna-
tion is unnecessary for a constructive discharge cause of
action because the "whole point" of constructive discharge
is to treat the resignation like a firing. *Ante,* at 11. I had
thought that the "whole point" of a Title VII disparate-
treatment claim was to combat *intentional* discrimination.
See, *e.g., Watson* v. *Fort Worth Bank & Trust*, 487 U. S.
977, 1002 (1988) (Blackmun, J., joined by Brennan and
Marshall, JJ., concurring in part and concurring in judg-
ment) ("[A] disparate-treatment challenge focuses exclu-
sively on the intent of the employer"). A resignation can-
not be deemed the equivalent of an actionable intentional
termination if the employer lacks intent to terminate. See
*Staub*, 562 U. S., at 417–418 (holding that a person who
"did not intend to cause [a] dismissal" cannot be deemed
"responsible" for the dismissal, even if the dismissal was
the "result" or "foreseeable consequence" of the person's
actions); see also *id.,* at 417 ("Intentional torts such as this
. . . generally require that the actor intend the *consequences*

of an act, not simply the act itself" (internal quotation marks omitted)). But as I have explained, a resignation in those circumstances may still be treated like a firing for damages purposes. Our cases demand nothing more.

## II
### A

The framework I propose respects the fundamental rule that an act done with discriminatory intent must have occurred within the limitations period. It also comports with the default rule that limitations periods start to run when a cause of action accrues. When an employer intends to force an employee to resign, the resignation gives rise to a new cause of action for constructive discharge, with a limitations period that runs from the date of the resignation. But when an employer does not intend to force the employee to resign, the employee's only cause of action is based on the underlying discriminatory acts, and the limitations period runs from the time *that* claim accrued.[5] It is thus entirely unnecessary for the majority to abandon the discriminatory-intent requirement in service of the "standard" limitations rule. These two rules fit together perfectly once one appreciates the dual nature of constructive discharge.

It is abundantly clear that the majority has abandoned the discriminatory-intent requirement and would deem a constructive discharge claim timely even if no discriminatory act occurred within the limitations period. The majority admits as much. It declares that the employer's

———————

[5] For example, if an unintended resignation was prompted by a discrete act like a humiliating demotion or transfer, the limitations period would run from the date of demotion or transfer. See *Morgan*, 536 U. S., at 110–113. If the resignation was prompted by an intolerable hostile work environment, the limitations period would run from any act that contributed to the hostile work environment. See *id.*, at 117–118.

discriminatory conduct and the employee's resignation are both "part of the 'matter alleged to be discriminatory,'" and therefore (in its view) the resignation may trigger the limitations period "*whatever* the role of discrimination in [the resignation] element." *Ante,* at 8 (emphasis added). To support this dubious proposition, the majority cites *Morgan*'s holding that an individual act contributing to a hostile work environment need not be independently actionable for the act to start a fresh limitations period. *Ante*, at 8–9. This analogy is particularly inapt because Green's constructive discharge claim is based on a discrete act, not a hostile work environment. See *supra,* at 4. Even setting that aside, *Morgan* held only that an act contributing to a hostile work environment need not be independently actionable by dint of its *severity*. That is because a hostile work environment claim is based on the "*cumulative* effect of individual acts" that may not "'sufficiently affect the conditions of employment to implicate Title VII'" unless considered in the aggregate. 536 U. S., at 115 (emphasis added). Nothing in *Morgan* suggests that the limitations period for a hostile work environment claim can run from *an act that is not discriminatory*. To the contrary, the Court referred to individual "act[s] of *harassment*"—such as "racial jokes, . . . racially derogatory acts, . . . negative comments regarding the capacity of blacks to be supervisors, and . . . various racial epithets"— as triggering the limitations period. *Id.,* at 115, 120 (emphasis added).

## B

The majority opines that its rule is better for employees because it prevents the limitations period from expiring before an employee resigns. *Ante,* at 9. Things are not that simple. The majority's rule benefits only those employees who can meet the demanding standard for constructive discharge, while setting a springe for those who

cannot. Constructive discharge is an "aggravated" form of discrimination involving truly "intolerable" working conditions that leave an employee no choice but to resign. *Suders*, 542 U. S., at 146–147. This is an objective standard, *id.,* at 141, and what is subjectively intolerable to a particular employee may strike a court or jury as merely unpleasant.

So imagine an employee who is subjected to sexual harassment at her federal workplace but—relying on the majority's rule—does not pursue EEO counseling until 45 days after the harassment leads her to resign. Suppose too that the last act of harassment occurred the day before she resigned. If a court ultimately concludes that the harassment was objectively intolerable and the employee was justified in resigning, she can recover for the constructive discharge. But if it turns out that she has proved only "ordinary discrimination" without the "something more" needed to establish constructive discharge, *id.,* at 147 (internal quotation marks omitted), the employee is doubly out of luck: Not only does her constructive discharge fail on the merits, but any "lesser included" hostile work environment claim that she might have brought (and prevailed on), *id.,* at 149, is time barred. Encouraging employees to wait until after resigning to pursue discrimination claims thus may needlessly deprive unwary discrimination victims of relief.

The better approach is to encourage employees to seek EEO counseling (or, in the private sector, file an EEOC charge) at the earliest opportunity, based on the underlying discriminatory acts.[6] Every allegation of constructive discharge must be based on an actionable discriminatory practice, see *ibid.*; 1 B. Lindemann, P. Grossman, & C.

_____

[6] The majority seems to agree that employees should promptly challenge the underlying discrimination, see *ante*, at 15, so why it disparages the idea elsewhere in its opinion, see *ante,* at 9, is beyond me.

Weirich, Employment Discrimination Law 21–49 (5th ed. 2012), for which the employee can immediately seek counseling and pursue a discrimination claim. If the employee later resigns, he or she can seek damages from the resignation as part of that timely claim. See *supra*, at 9, and n. 4. Under the framework I have set forth, an employee who fails to pursue the underlying discrimination claim can still pursue a standalone constructive discharge claim so long as there is sufficient evidence that the employer acted with intent to force the employee to resign. This will often be the case when working conditions are so intolerable that a reasonable employee would be compelled to quit. The employer will usually be aware that conditions are terrible, and "[p]roof that a defendant acted knowingly very often gives rise to a reasonable inference that the defendant also acted purposely." *Loughrin* v. *United States*, 573 U. S. ___, ___ (2014) (ALITO, J., concurring in part and concurring in judgment) (slip op., at 3).[7] But the possibility of recovering damages for only the constructive discharge, and not for discrimination suffered before the resignation, will be an unsatisfactory alternative for many employees who have suffered through unendurable working conditions.

## III

It remains to apply the foregoing principles to this case. The Tenth Circuit held that the Postal Service was entitled to summary judgment on its limitations defense. The

_____

[7] Given this inference, it is hard to see why the majority thinks that it "would often be difficult to allege plausibly" that such an employer intended to force the employee to resign. *Ante,* at 12. It is not inherently more difficult (and it will often be easier) to allege and prove that an employer intended the foreseeable consequences of its actions than it is to allege and prove that an employer acted because of discriminatory animus against an employee's race, sex, religion, or other protected characteristic—a burden every Title VII plaintiff must carry.

question therefore is whether Green adduced sufficient evidence from which a jury could reasonably conclude that the Postal Service *intended* to force his resignation when it presented him with the settlement agreement. If so, then the limitations period ran from the date of Green's resignation.

I have little trouble concluding that Green has carried his burden. Indeed, the Postal Service virtually concedes the point. It observes that the agreement expressly stated that Green *would* retire, and provided for his reporting to duty in Wamsutter, Wyoming, only in the event that the retirement fell through. App. 60–61; Brief for Respondent 33. A jury could reasonably conclude that the Postal Service, by offering Green a choice between retiring and taking a lower paying job hundreds of miles away, intended to make him choose retirement. Accordingly, for summary judgment purposes, the 45-day window for contacting an EEO counselor ran from the date on which Green resigned—or, more precisely, the date on which he gave the Postal Service notice of his retirement, see *ante,* at 16.

I am inclined to agree with Green that—viewing the evidence in the light most favorable to him—he did not give notice of his retirement until he submitted his retirement papers, making his claim timely. Although the settlement agreement provided that he would retire, it alternatively allowed him to transfer to Wyoming. Unless Green would have been turned away from the Wamsutter Post Office despite that language had he chosen to go there, it was not until Green submitted his retirement papers that one could say with certainty that his position would be terminated rather than transferred. That said, like the majority I am content to leave this question for the Tenth Circuit to tackle on remand. I accordingly concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–613

_____

## MARVIN GREEN, PETITIONER *v.* MEGAN J. BRENNAN, POSTMASTER GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[May 23, 2016]

JUSTICE THOMAS, dissenting.

Title VII of the Civil Rights Act of 1964 prohibits employers from engaging in discriminatory acts against their employees. Under a 1992 Equal Employment Opportunity Commission (EEOC) regulation implementing Title VII, federal employees "who believe they have been discriminated against" "must consult a[n] [EEOC] Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 CFR §1614.105(a) (2015). In particular, the aggrieved employee "must initiate contact with a Counselor within 45 days of date of the matter alleged to be discriminatory." §1614.105(a)(1).

Today, the majority holds that a "matter alleged to be discriminatory" includes a matter that is not "discriminatory" at all: a federal employee's decision to quit his job. *Ante,* at 5–6. The majority reaches this conclusion by adopting an atextual reading of the regulation that expands the constructive-discharge doctrine. Consistent with the text of the regulation and history of the constructive-discharge doctrine, I would hold that only an employer's actions may constitute a "matter alleged to be discriminatory." Because the only employer action alleged to be discriminatory here took place more than 45 days before petitioner Marvin Green contacted EEOC, his claims are untimely. I therefore respectfully dissent.

I

The meaning of a "matter alleged to be discriminatory" refers to actions taken by the employer, not the employee. This follows from the ordinary meaning of "matter" and "discriminatory," as well as this Court's precedents.

A

I begin with "'the language [of the regulation] itself and the specific context in which that language is used.'" *McNeill* v. *United States*, 563 U. S. 816, 819 (2011) (brackets omitted). When a word or phrase is left undefined—as "matter alleged to be discriminatory" is—we consider its "ordinary meaning." *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187 (1995). A "matter" is "a subject under consideration, esp. involving a dispute or litigation" or "[s]omething that is to be tried or proved; an allegation forming the basis of a claim or defense." Black's Law Dictionary 992 (7th ed. 1999); The Oxford English Dictionary 481 (2d ed. 1989) ("matter" means "[a]n event, circumstance, fact, question, state or course of things, etc., which is or may be an object of consideration or practical concern; a subject, an affair, a business"); see *ante*, at 5 (embracing this view). The term "discriminatory" means characterized by differential treatment that lacks a sound justification. See The Random House Dictionary of the English Language 564 (2d ed. 1987) ("discriminatory" means "characterized by or showing prejudicial treatment esp. as an indication of racial, religious, or sexual bias"); B. Garner, A Dictionary of Modern Legal Usage 191 (1987) ("discriminatory" means "applying discrimination in treatment, esp. on ethnic grounds"); Black's Law Dictionary 479 ("discrimination" means characterized by "[d]ifferential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored"). Thus, a "matter alleged to be discriminatory" means an employee's

allegation that he was treated in an unjustifiably differential manner.

In the context of employment discrimination, only an employer can discriminate against—or apply unjustifiable differential treatment to—an employee.[1]  An employee cannot plausibly be said to discriminate against himself. It therefore makes no sense to say that an employee's act of quitting constitutes an action in which he was treated in a differential manner that lacked a sound justification.

And, it does not make any more sense to say that an employee's decision to quit is itself "discriminatory" simply because it may result from antecedent discriminatory conduct.  As two of our precedents—*National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101 (2002), and *Delaware State College* v. *Ricks*, 449 U. S. 250 (1980)—illustrate, the "matter alleged to be discriminatory" is the *reason* the employee quit, and not the quitting itself.

In *Morgan*, we rejected the argument that a phrase similar to "matter alleged to be discriminatory"—namely, an "alleged unlawful employment practice"—"connotes an ongoing violation that can endure or recur over a period of time."  536 U. S., at 109–111.  We held that discrete discriminatory acts of the employer occurring outside a filing period were not actionable, even if connected to other acts within the period.  *Id.,* at 113.  The word "practice," we explained, did not "conver[t] related discrete acts into a single unlawful practice for the purposes of timely filing." *Id.,* at 111.  The same is true of the word "matter."  See, *e.g.,* EEOC Compliance Manual: Threshold Issues §2– IV(C)(1), n. 179 (equating "matter alleged to be discriminatory" with "the alleged discriminatory employment

––––––––

[1] Title VII defines the term "employer" to include "agent[s]" of the employer.  42 U. S. C. §2000e(b).

practice"), online at http://www.eeoc.gov/policy/docs/
threshold.html (as last visited Mar. 29, 2016) (equating
"matter alleged to be discriminatory" with "the alleged
discriminatory employment practice").

*Ricks* complements *Morgan* by holding that discrimina-
tion occurs when an employer takes some adverse action
against the employee, and not when the employee feels the
consequences of that action. 449 U. S., at 257–258. In
*Ricks*, we considered the timeliness of an EEOC complaint
that a professor filed after he was allegedly denied tenure
on account of his national origin. *Id.,* at 252–254. The
employer offered him a contract to teach one more year
after it denied tenure. *Id.*, at 255. The professor contended
that his claim did not accrue until his 1-year contract
expired, because the offer of the contract constituted a
"'continuing violation.'" *Id.*, at 257. We rejected that
argument and explained that "[m]ere continuity of em-
ployment, without more, is insufficient to prolong the life
of a cause of action for employment discrimination." *Ibid.*;
see also *Chardon* v. *Fernandez*, 454 U. S. 6, 8 (1981) (*per
curiam*) (holding that claims of administrators of the
Puerto Rican Department of Education were untimely
because their claims accrued when they received notice
that they would be fired and not on the effective date of
their terminations).

The alleged employer conduct that most immediately
prompted Green's decision to quit was the Postal Service's
request on or about December 15, 2009, that he sign a
settlement agreement. See App. 17, ¶72; App. 19, ¶83. It
is irrelevant whether Green's decision to quit "g[a]v[e]
present effect to the past illegal act[s] and therefore per-
petuate[d] the consequences of forbidden discrimination."
*Ricks*, *supra*, at 258 (internal quotation marks omitted).
Because the Postal Service's December 15 request is the

"matter alleged to be discriminatory," Green had 45 days from December 15 to initiate contact with EEOC.[2] Because he was 52 days late in doing so, his claim was untimely.

B

The majority reaches the opposite conclusion for three reasons. None withstands scrutiny.

First, the majority observes that the text of the regulation is "not particularly helpful" because the word "matter" simply means " 'an allegation forming the basis of a claim or defense,' " which "could readily apply to a discrimination-precipitated resignation." *Ante*, at 5. Thus, the majority contends, "matter" could "reasonably be interpreted to include the factual basis for a claim," which, in its view, includes Green's decision to resign. *Ante*, at 10. But, as explained, that interpretation does not grapple with the entire phrase, "matter *alleged to be discriminatory*," which does not encompass the subsequent nondiscriminatory actions that the employee takes.

Second, the majority contends that the "standard rule for limitations periods" informs its understanding of 29 CFR §1614.105. *Ante*, at 6 (internal quotation marks omitted). Under this rule, the majority contends, a limitations period does not begin to run until there is a "complete and present cause of action." *Ante*, at 6 (internal quotation marks omitted). The majority concludes that

─────────
[2] Title VII does not provide federal employees with a cause of action for retaliation. *Ante*, at 3, n. 1. Title VII's federal-sector provision incorporates certain private-sector provisions related to discrimination but does not incorporate the provision prohibiting retaliation in the private sector. See 42 U. S. C. §2000e–16(d) (incorporating §§2000e–5(f) to (k) but not §2000e–3(a), which forbids private-sector retaliation). In light of this text, I have grave doubts that Green—as a federal employee—has a claim for retaliation. But because the parties do not raise this issue, and the majority leaves it open, I need not resolve it.

there is no "complete and present cause of action" for constructive discharge until "an employee resigns." *Ibid.* (internal quotation marks omitted).

Even assuming that an employee's resignation was an essential part of a constructive discharge "claim" (but see Part II, *infra*) the "standard rule" is merely a "default" rule. *Graham County Soil & Water Conservation Dist.* v. *United States ex rel. Wilson*, 545 U. S. 409, 418 (2005). That "default rule" does not apply, however, where—as here—the text confirms that the limitations period begins to run *before* the cause of action accrues.

*Pillsbury* v. *United Engineering Co.*, 342 U. S. 197 (1952), confirms this point. In that case, the Court considered a statute that provided that "'[t]he right to compensation for disability . . . shall be barred unless a claim therefor is filed within one year after the injury.'" *Id.,* at 197 (quoting 33 U. S. C. §913(a) (1952)). The Court held that the 1-year period began at the time of injury, not when the employee later became disabled as a result of the injury and concluded that "Congress meant what it said when it limited recovery to one year from date of injury, and 'injury' does not mean 'disability.'" 342 U. S., at 199–200. Although that reading meant that "an employee [could] be barred from filing his claim before his right to file it arises," the Court refused to "rewrite the statute of limitations" to avoid that result. *Ibid.*; see also, *e.g., Dodd* v. *United States*, 545 U. S. 353, 357–360 (2005) (giving effect to the clear text of a limitations provision even though that reading "ma[de] it difficult" for certain movants "to obtain relief" and could lead to "harsh results").

Like the limitations provision in *Pillsbury*, 29 CFR §1614.105 makes clear that the limitations period could begin before any constructive-discharge claim accrues, lest "what was intended to be a limitation [be] no limitation at all." 342 U. S., at 200. The regulation instructs that the limitations period begins to run when the "matter alleged

to be discriminatory" occurs—*i.e.,* the discriminatory conduct of the employer. To say that this includes Green's resignation could "have the effect of extending the limitation indefinitely." *Ibid.*; see Part I–A, *supra.*

Finally, the majority downplays *Morgan* and *Ricks* by claiming that Green's resignation was "not merely an inevitable consequence of the discrimination he suffered; it is an essential part of his constructive-discharge claim." *Ante*, at 13. "[A] claim that an employer constructively discharged an employee," the majority contends, "is no different from a claim that an employer actually discharged an employee." *Ante,* at 7. This reasoning cannot be reconciled with the regulatory text and fails to grapple with our precedents. By isolating Green's late response to the settlement agreement rather than his employer's alleged coercion of Green to sign that agreement, the majority ignores the discriminatory act and bestows on Green an advantage that other employees subject to wrongful discrimination do not have. Had Green signed termination papers rather than settlement papers, there would be no question about the untimeliness of his claims. As in *Ricks*, the time for Green's claim would have begun to run when his employer discriminated against him, even if the termination was not effective until months later. 449 U. S., at 257; see also *Chardon*, 454 U. S., at 8 (same). But today, the majority decides that Green's claim is different. In doing so, the majority elevates constructive discharge to the status of a super termination capable of extending a limitations period far beyond the time the employer acted discriminatorily.

## II

The majority's error is not merely one of regulatory misinterpretation. By misreading the regulation, the majority expands the constructive-discharge doctrine beyond its original bounds. In particular, the majority

cements the (mistaken) notion that constructive discharge is an independent cause of action—and not a mere counterdefense—by unjustifiably focusing on an employee's response to an employer's conduct. See, *e.g., ante*, at 6–14. In doing so, the majority exacerbates the problems that *Pennsylvania State Police* v. *Suders*, 542 U. S. 129 (2004), first created in adopting a capacious definition of "constructive discharge."

## A

In holding that a discrimination claim based on constructive discharge accrues when an employee resigns, the majority wrongly assumes that constructive discharge is a separate claim equivalent to an actual discharge under Title VII. *Ante*, at 10–11. But the constructive-discharge doctrine is best understood as "a counter-defense to the employer[']s defense that the worker [voluntarily] quit," and not a separate claim. *EEOC* v. *R. J. Gallagher Co.*, 959 F. Supp. 405, 408 (SD Tex. 1997), vacated in part on other grounds, 181 F. 3d 645 (CA5 1999).

The National Labor Relations Board (NLRB) developed the constructive-discharge doctrine in the 1930's "to address situations in which employers coerced employees to resign, often by creating intolerable working conditions, in retaliation for employees' engagement in collective activities." *Suders*, *supra*, at 141; see also Shuck, Comment, That's It, I Quit: Returning to First Principles in Constructive Discharge Doctrine, 23 Berkeley J. Empl. & Lab. L. 401, 406–407 (2002). An employee who voluntarily quit usually lost the right to backpay and other remedies, whereas an employee who was fired for discriminatory reasons did not. See *id.,* at 403. The constructive-discharge doctrine enabled courts to provide a remedy to those employees who voluntarily quit based on the fiction that their decision to quit was not actually voluntary. See *ibid.*; *Suders*, *supra*, at 147, n. 8. Thus, as it was originally

conceived, constructive discharge was not an independent cause of action but instead a counterdefense to an employer's contention that a resignation was voluntary, and thus, should "factor into the damages." *Knabe* v. *Boury Corp.*, 114 F. 3d 407, 408, n. 1 (CA3 1997); see also *Russ* v. *Van Scoyoc Assoc., Inc.*, 122 F. Supp. 2d 29, 35–36 (DC 2000) (collecting cases). So understood, an employee's resignation does not complete any cause of action, and thus does not trigger the limitations period.

The majority contends that *Suders* marked a departure from this original conception of constructive discharge by "expressly h[o]ld[ing] that constructive discharge is a claim distinct from the underlying discriminatory act." *Ante,* at 11. But, that case does not resolve the issue one way or the other. To be sure, *Suders* contains a few statements suggesting that constructive discharge is a claim. As the majority points out, for example, *Suders* states that a hostile work environment claim is less "grav[e]" than a "*claim* of hostile-environment constructive discharge," and "a claim for constructive discharge lies under Title VII." *Ante,* at 11 (citing *Suders*, 542 U. S., at 142, 149; emphasis added); see also *id.*, at 133 (referring to "sexual harassment/constructive discharge claim"); *id.,* at 143 (referring to "constructive discharge claims"). At the same time, however, the question at issue in *Suders* was the availability of affirmative defenses. In that vein, *Suders* held only that employers could avail themselves of those defenses if an "official act" of the company "d[id] not underlie the constructive discharge." *Id.*, at 148. There are also statements throughout the *Suders* opinion that are flatly inconsistent with the reading that the majority suggests. For example, it points out that an employee's resignation is "assimilated to a formal discharge" for "*remedial purposes*," without mentioning liability. *Id.,* at 141 (emphasis added); see also *id.,* at 147, n. 8 (noting that "a prevailing constructive discharge plaintiff is entitled to

all damages available for formal discharge," including "backpay" and sometimes "frontpay"); *id.,* at 148 ("a constructive discharge is functionally the same as an actual termination in *damages-enhancing respects*" (emphasis added)). In short, *Suders* does not resolve whether constructive discharge depends on the underlying discriminatory act. And, it does not hold that constructive discharge is a cause of action that is distinct from the underlying discrimination claim.

B

The majority today not only exploits *Suders*' imprecision about whether constructive discharge is an independent claim, but also takes advantage of that opinion's ambiguity as to what an employee must establish to invoke the doctrine. In *Suders*, I objected to the Court's statement that the constructive-discharge doctrine encompasses those situations in which "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Id.*, at 141. That description does "not in the least resemble actual discharge" because it permits an employee "to allege a constructive discharge absent any adverse employment action" and absent any employer intent to cause a resignation. *Id.,* at 153–154 (THOMAS, J., dissenting).

Despite the *Suders* Court's overly broad description of the doctrine, the Court at least retained some focus on an employer's conduct. The Court in *Suders* explained that whether to "assimilat[e]" a constructive discharge "to a formal discharge for remedial purposes" entailed an "objective" inquiry that focused on the "working conditions" themselves. *Id.,* at 141. And, it held that an employer could raise certain affirmative defenses to stave off liability when no official action forced an employee to resign. *Id.,* at 147.

Today, the majority goes even further than *Suders* in

THOMAS, J., dissenting

eviscerating the limitations on the constructive-discharge doctrine. The majority's rule transforms constructive discharge into a claim focused on the employee's conduct, instead of the employer's. Green does not allege that, after he signed the settlement agreement, any other act— by a supervisor or even a co-worker—occurred or otherwise immediately precipitated his decision to quit. See App. 19, ¶¶83–85. The majority's holding—that Green's claim accrued when he resigned—must rest then on Green's own subjective feelings about the forced settlement. By ignoring the date on which an employer's discriminatory act occurred and instead focusing only on an employee's subjective response to that discriminatory act (see *ante,* at 12–14), the majority dispenses with the function of an employer's conduct. The effect of the majority's analysis, then, is that constructive discharge no longer involves any sort of objective inquiry.

I cannot agree. The concept of constructive discharge is already on tenuous footing. It is not based on the text of Title VII but instead on the fiction that an employee's resignation can be attributed to his employer in limited circumstances. As initially conceived by the NLRB, this fictitious attribution could be justified if an employer's unlawful employment practice "*standing alone*, render[ed] an employee's resignation reasonable and [thus] entitle[d] the employee to backpay." Shuck, 23 Berkeley J. Empl. & Lab. L., at 409 (emphasis added); see, *e.g., In re Waples-Platter Co.*, 49 N. L. R. B. 1156, 1174–1175 (1943) (concluding that it was reasonable *per se* for the employees to quit in light of the nature of the employer's intentional, discriminatory transfers). Such attribution cannot be justified, however, where—as here—the constructive discharge accrues based solely on an employee's subjective response to alleged discrimination.

\*    \*    \*

THOMAS, J., dissenting

Because Green has not proffered any evidence that discrimination continued to occur after he signed the settlement agreement, his contact with EEOC was untimely under 29 CFR §1614.105. Accordingly, I would affirm the judgment of the Court of the Appeals.